UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| TIMOTHY AIKEN, JOSEPH ANNIBALE, IVAN ASCENDIO, JOSEPH BAKER, MICHAEL BANAHAN, BARBARA BARILE IN HER OWN CAPACITY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF VINCENT BARILE, LINDA BELINSKY IN HER OWN CAPACITY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF THOMAS BELINSKY, EMILIO BERMONTY, MICHAEL BITTNER IN HIS OWN CAPACITY AND AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF JEFFREY BITTNER, ANTHONY BLOUNT, KATHLEEN BONDESON IN HER OWN CAPACITY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF FRANK BONDESON, YULY BOTERO, SIMONE BOYLES IN HER OWN CAPACITY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MELBA BOYLES, HAVA BRACIC, ROBERT BRAGER, MICHAEL BRUETSCH, JOHN CUDDY JR., ANTONIO D'ALLEVA, MARTIN DAVIN, NICHOLAS DIBRINO, NICHOLAS DIBULLO, GERALD D'ONOFRIO, SUMINTRA DOOKIE, ANA DURAN, CARL DYER, RICHARD T. ECKERT, HESHAM ELSAYED, ALOYSIUS EMEGA, LUIS ENRIQUEZ, ENNY ESPINOSA, MICHAEL ESPOSITO, JOHN FABRY, CHRISTOPHER FEDELE, STEPHANIE FEDORISHIN, DARRYL FORD, JOHN FOY, PETER FRONIMAKIS, DONNA GABRIELE, BRIAN GAFFNEY, FRANK GEFFRE, JOSEPH GENOVA, OSCAR GONZALEZ, NATASHA MCRAE IN HER OWN CAPACITY AND AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF LEROY GRAY, EDWARD GUILBAULT, CHARLES HERNANDEZ, FREDERICK HOLM, DANIEL HUNT, BRIAN HUNTLEY, SALVATORE IMBURGIA, JOHN JAMES,  ROBERT JONES, KEVIN KERRIGAN, MICHAEL LALLY, GEORGE LASALA, LINDA LAURIE, GARY LEE, TOMMY LEE, JOHN LEO, VINNETTE LEO, CARMEN LICARI, HILDA LLERENA, FRANK LOMBARDO, JOSEPH LOPALO, ROBERT LOPEZ, THOMAS MAGUIRE, DEONARINE MANBODH, MARILYN MARSICANO, WAYNE MAZZELLA, CORTWRIGHT MCINTOSH, JOHN MCNAMARA, SEAN MCNAMEE, FRANK MENDOLIA, HENRY MIANO, GILBERT MOLINA, | Index No.:<br>Date Purchased:<br><br>**<u>COMPLAINT</u>**<br><br>This Action Relates to:<br>In re: Terrorist Attacks on September 11, 2001<br><br><br>*Plaintiffs Demand Trial By Jury* |

1

CHAN MONGOL, CHRISTOPHER MONTEIRO, ANDRES MORA, NICHOLAS MOUKAZIS, JOSEPH F. MURRAY, ADAM NOBLE, ATILLA NOVOGRADECZ, JAORIBE OLADEJI, FELIX OPIA, CHARLES OTT, CHRISTOPHER O'ROURKE, CLIFFORD PIERROT, ANGELO PINTO, MARIA PUMA, TIMOTHY QUINN, NATALIA QUINTANILLA, SEGUNDO QUIZHPI, RAYMOND J. RAGUSA, ORLANDO RAMIREZ, RAFAEL RAMOS, RICHARD RAMOS, ANTOINETTE REIG, JAY REITER, DAVID REYNOLDS, CARLOS RIOS, DAVID RIVAS, FRANCISCO RIVAS, CHARLES ROBERTS, ANTHONY ROBILOTTO, WILLIAM ROCK, ANGEL RODRIGUEZ, JOSE F. RODRIGUEZ, MIGUEL RODRIGUEZ, ROSA RODRIGUEZ, SUSANA RODRIGUEZ, CHRISTOPHER ROGERS, ROBERT ROHAN, JAIME ROJAS, MARIO ROJAS, CARMEN ROMERO, JOHN ROSS, SERGE RUGGIO, IGBALIJA RUGOVAC, SHAWN RYAN, HIPOLITO SALGADO, APOLINAR SANCHEZ, DANIEL SANCHEZ, DELTA E. SANCHEZ, GEORGE SANCHEZ, JOSE SANCHEZ, JOSE SANCHEZ, RICHARD L. SANCHEZ, ROCIO SANCHEZ, LUIS SANGUNA, ANSELMO SANTONI, ANTHONY SANTORO, BOBIE L. SCARBOROUGH, PETER SCARLATOS, JOSEPH SCARPINITO, PETER SCHEMBRI, WILLIAM SCHILLINGER, ROBERT SCHNEBLY, BENJAMIN SCHNEIER, GEORGE SCHULTZ, LUIS SEGARRA, JAMES SEIFERHELD, THERESA SERRANO, NANCY SIGUENCIA, RAUL SIGUENCIA, ENRIQUE SILVA, JOHN SIMADIS, VINCENT SINNOTT, WINSTON SMALL, EDWARD SMITH, STEPHEN SOLDANO, JAMES SPATAFORA, JOSEPH SPATARO, WALTER STEIN, ROBERT STEINER, MARK STENGER, RICHARD SUFFERN, DAVID SULLIVAN, PAUL SULLIVAN, SAMUEL SUMBA, CHRISTOPHER SWIERKOWSKI, BERTHA TACHE, GREGORY TAYLOR, LEONARD TAYLOR, RONALD TAYLOR, JUAN TEJERA, FRANCIS THOMAS, KAREN TOBIAS, CHRISTINE TORRES, DIANA TORRES, MIGUEL TORRES, THOMAS TRIPOULAS, NELLIE TROIANO, STEVEN TROSTEN, THOMAS TRZASKA, CYRIL TYSON, ROSA VALDEZ, GISELA VALENCIA, FRANCISCO VAZQUEZ, KATTIA VAZQUEZ, PETER VAZQUEZ, MYRIAM VEGA, LUCRECIA VELEZ, WILLIAM VELEZ, LOUIS VENA, ROBERT J. VERHELST, MICHAEL VITALE, ANDREW VITIELLO, DEBRA

WAGNER, CHARLES WALSH, GEORGE WARE, JOHN WARREN, ANCIL WATSON, STACY WEISS, THEOPHILUS WELLS III, DELORES WILLIAMS, ALLEGRA WILSON, JEAN WINTER ON HER OWN BEHALF AND IN HER CAPACITY AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF RICHARD WINTER, ROBERT WOLF ON HIS OWN BEHALF AND IN HIS CAPCITY AS THE PERSOAL REPRESENTATIVE OF THE ESTATE OF KENNETH WOLF, MATILDE YAMASQUI, JOSEPH E. YOUNG, VINCENT ZAPPULLA, JAMES ZOCCOLI

Plaintiff(s)

-against-

KINGDOM OF SAUDI ARABIA, SAUDI BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO TRANS ARABIA

Defendant(s).

Plaintiffs, by their attorneys, **NAPOLI SHKOLNIK, PLLC,** complaining of the defendants, respectfully alleges upon information and belief hereinafter:

## PLAINTIFFS

1. Plaintiff TIMOTHY AIKEN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

2. Plaintiff JOSEPH ANNIBALE, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

3

3. Plaintiff IVAN ASCENCIO, is a resident of the State of Virginia, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

4. Plaintiff JOSEPH BAKER, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

5. Plaintiff MICHAEL BANAHAN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

6. Plaintiff BARBARA BARILE, is a resident of the State of New York, and brings this action on her own behalf and in her capscity as the Personal Representative of the Estate of Vincent Barile, Deceased, and is entitled to recover damages on the causes of action set forth herein.

7. Plaintiff LINDA BELINSKY, is a resident of the State of New York, and brings this action on her own behalf and in her capscity as the Personal Representative of the Estate of Thomas Belinsky, Deceased, and is entitled to recover damages on the causes of action set forth herein

8. Plaintiff EMILIO BERMONTY, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

9. Plaintiff MICHAEL BITTNER, is a resident of the State of Connecticut, and brings this action on his own behalf and in his capacity as the Personal Representative for the Estate of Jeffrey Bittner, Deceased, and is entitled to recover damages on the causes of action set forth herein.

10. Plaintiff ANTHONY BLOUNT, is a resident of the State of New York, and brings this action on his own behalf to recover damages on the causes of action set forth herein.

11. Plaintiff KATHLEEN BONDESON, is a resident of the State of New York, and brings this action on her own behalf and in her capacity as the Personal Representative for the Estate of Frank Bondeson, Deceased, and is entitled to recover damages on the causes of action set forth herein.

12. Plaintiff YULY BOTERO, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

13. Plaintiff SIMONE BOYLES, is a resident of the State of New York, and brings this action on her own behalf and in her capacity as the Personal Representative for the Estate of Melba Boyles, Deceased, and is entitled to recover damages on the causes of action set forth herein.

14. Plaintiff HAVA BRACIC, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

15. Plaintiff ROBERT BRAGER, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

16. Plaintiff MICHAEL BRUETSCH, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

17. Plaintiff JOHN CUDDY JR., is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

18. Plaintiff ANTONIO D'ALLEVA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

19. Plaintiff MARTIN DAVIN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

20. Plaintiff NICHOLAS DIBRINO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

21. Plaintiff NICHOLAS DIBULLO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

22. Plaintiff GERALD D'ONOFRIO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

23. Plaintiff SUMINTRA DOOKIE, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

24.     Plaintiff ANA DURAN, is a resident of the State of New Jersey, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

25.     Plaintiff CARL DYER, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

26.     Plaintiff RICHARD ECKERT, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

27.     Plaintiff HESHAM ELSAYED, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

28.     Plaintiff ALOYSIUS EMEGA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

29.     Plaintiff LUIS ENRIQUEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

30.     Plaintiff ENNY ESPINOSA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

31.     Plaintiff MICHAEL ESPOSITO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

32.     Plaintiff JOHN FABRY, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

33.     Plaintiff CHRISTOPHER FEDELE, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

34.     Plaintiff STEPHANIE FEDORISHIN, is a resident of the State of New Jersey, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

6

35.     Plaintiff DARRYL FORD, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

36.     Plaintiff JOHN FOY, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

37.     Plaintiff PETER FRONIMAKIS, is a resident of the State of Florida, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

38.     Plaintiff DONNA GABRIELE, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

39.     Plaintiff BRIAN GAFFNEY, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

40.     Plaintiff FRANK GEFFRE, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

41.     Plaintiff JOSEPH GENOVA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

42.     Plaintiff OSCAR GONZALEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

43.     Plaintiff NATASHA MCRAE, is a resident of the State of New York, and brings this action on her own behalf and as the Personal Representative for the Estate of Leroy Gray, and is entitled to recover damages on the causes of action set forth herein.

44.     Plaintiff RICHARD GROCCIA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

45.     Plaintiff EDWARD GUILBAULT, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

46.     Plaintiff CHARLES HERNANDEZ, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

47.     Plaintiff FREDERICK HOLM, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

48.     Plaintiff DANIEL HUNT, is a resident of the State of Florida, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

49.     Plaintiff BRIAN HUNTLEY, is a resident of the State of South Carolina, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

50.     Plaintiff SALVATORE IMBURGIA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

51.     Plaintiff JOHN JAMES, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

52.     Plaintiff ROBERT JONES, is a resident of the State of Illinois, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

53.     Plaintiff KEVIN KERRIGAN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

54.     Plaintiff MICHAEL LALLY, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

55.     Plaintiff GEORGE LASALA, is a resident of the State of New York and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

56.     Plaintiff LINDA LAURIE, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

57.     Plaintiff GARY LEE, is a resident of the State of Virginia, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

58.     Plaintiff TOMMY LEE, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

59.     Plaintiff JOHN LEO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

60.     Plaintiff VINNETTE LEO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

61.     Plaintiff CARMEN LICARI, is a resident of the State of New Jersey, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

62.     Plaintiff HILDA LLERENA, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

63.     Plaintiff FRANK LOMBARDO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

64.     Plaintiff JOSEPH LOPALO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

65.     Plaintiff ROBERT LOPEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

66.     Plaintiff THOMAS MAGUIRE, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

67.     Plaintiff DEONARINE MANBODH, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

68.     Plaintiff MARILYN MARSICANO, is a resident of the State of Pennsylvania, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

69.     Plaintiff WAYNE E. MAZZELLA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

70.     Plaintiff CORTWRIGHT MCINTOSH, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

71.     Plaintiff JOHN MCNAMARA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

72.     Plaintiff SEAN MCNAMEE, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

73.     Plaintiff FRANK MENDOLIA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

74.     Plaintiff HENRY MIANO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

75.     Plaintiff GILBERT MOLINA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

76.     Plaintiff CHAN MONGOL, is a resident of Canada, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

77.     Plaintiff CHRISTOPHER MONTEIRO, is a resident of the State of Rhode Island, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

78.     Plaintiff ANDRES MORA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

79.     Plaintiff NICHOLAS MOUKAZIS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

80.     Plaintiff JOSEPH F. MURRAY, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

81.     Plaintiff ADAM NOBLE, is a resident of the State of Florida, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

82.     Plaintiff ATILLA NOVOGRADECZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

83.     Plaintiff JAORIBE OLADEJI, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

84.     Plaintiff FELIX OPIA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

85.     Plaintiff CHARLES OTT, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

86.     Plaintiff CHRISTOPHER O'ROURKE, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

87.     Plaintiff CLIFFORD PIERROT, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

88.     Plaintiff ANGELO PINTO, is a resident of the State of Pennsylvania, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

89.     Plaintiff MARIA PUMA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

90.     Plaintiff TIMOTHY QUINN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

91.     Plaintiff NATALIA QUINTANILLA, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

92.     Plaintiff SEGUNDO QUIZHPI, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

93.     Plaintiff RAYMOND J. RAGUSA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

94.     Plaintiff ORLANDO RAMIREZ, is a resident of the State of New Jersey, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

95.     Plaintiff RAFAEL RAMOS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

96.     Plaintiff RICHARD RAMOS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

97.     Plaintiff ANTOINETTE REIG, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

98.     Plaintiff JAY REITER, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

99.     Plaintiff DAVID REYNOLDS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

100.    Plaintiff CARLOS RIOS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

101.    Plaintiff DAVID RIVAS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

102.    Plaintiff FRANCISCO RIVAS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

103.    Plaintiff CHARLES ROBERTS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

104.    Plaintiff ANTHONY ROBILOTTO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

105.    Plaintiff WILLIAM ROCK, is a resident of the State of Florida, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

106.    Plaintiff ANGEL RODRIGUEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

107.    Plaintiff JOSE F. RODRIGUEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

108.    Plaintiff MIGUEL RODRIGUEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

109.    Plaintiff ROSA RODRIGUEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

110.    Plaintiff SUSANA RODRIGUEZ, is a resident of the State of New Jersey, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

13

111.    Plaintiff CHRISTOPHER ROGERS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

112.    Plaintiff ROBERT ROHAN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

113.    Plaintiff JAIME ROJAS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

114.    Plaintiff MARIO ROJAS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

115.    Plaintiff CARMEN ROMERO, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

116.    Plaintiff JOHN ROSS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

117.    Plaintiff SERGE RUGGIO, is a resident of the State of Florida, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

118.    Plaintiff IGBALIJA RUGOVAC, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

119.    Plaintiff SHAWN RYAN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

120.    Plaintiff HIPOLITO SALGADO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

121.    Plaintiff APOLINAR SANCHEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

122.    Plaintiff DANIEL SANCHEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

14

123.    Plaintiff DELTA SANCHEZ, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

124.    Plaintiff GEORGE SANCHEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

125.    Plaintiff JOSE SANCHEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

126.    Plaintiff JOSE SANCHEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

127.    Plaintiff RICHARD L. SANCHEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

128.    Plaintiff ROCIO SANCHEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

129.    Plaintiff LUIS SANGUNA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

130.    Plaintiff ANSELMO SANTONI, is a resident of the State of Florida, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

131.    Plaintiff ANTHONY SANTORO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

132.    Plaintiff BOBIE SCARBOROUGH, is a resident of the State of South Carolina, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

133.    Plaintiff PETER SCARLATOS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

134.    Plaintiff JOSEPH SCARPINITO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

135.    Plaintiff PETER SCHEMBRI, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

136.    Plaintiff WILLIAM SCHILLINGER, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

137.    Plaintiff ROBERT SCHNEBLY, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

138.    Plaintiff BENJAMIN SCHNEIER, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

139.    Plaintiff GEORGE SCHULTZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

140.    Plaintiff LUIS SEGARRA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

141.    Plaintiff JAMES SEIFERHELD, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

142.    Plaintiff THERESA SERRANO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

143.    Plaintiff NANCY SIGUENCIA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

144.    Plaintiff RAUL SIGUENCIA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

145.    Plaintiff ENRIQUE SILVA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

146.    Plaintiff JOHN SIMADIS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

147.    Plaintiff VINCENT SINNOTT, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

148.    Plaintiff WINSTON SMALL, is a resident of the State of Maryland, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

149.    Plaintiff EDWARD SMITH, is a resident of the State of New Jersey, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

150.    Plaintiff STEPHEN SOLDANO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

151.    Plaintiff JAMES SPATAFORA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

152.    Plaintiff JOSEPH SPATARO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

153.    Plaintiff WALTER STEIN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

154.    Plaintiff ROBERT STEINER, is a resident of the State of Connecticut, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

155.    Plaintiff MARK STENGER, is a resident of the State of Missouri, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

156.    Plaintiff RICHARD SUFFERN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

157.    Plaintiff DAVID SULLIVAN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

17

158. Plaintiff PAUL SULLIVAN, is a resident of the State of Connecticut, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

159. Plaintiff SAMUEL SUMBA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

160. Plaintiff CHRISTOPHER SWIERKOWSKI, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

161. Plaintiff BERTHA TACHE, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

162. Plaintiff GREGORY TAYLOR, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

163. Plaintiff LEONARD TAYLOR, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

164. Plaintiff RONALD TAYLOR, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

165. Plaintiff JUAN TEJERA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

166. Plaintiff FRANCIS THOMAS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

167. Plaintiff KAREN TOBIAS, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

168. Plaintiff CHRISTINE TORRES, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

169.    Plaintiff DIANA TORRES, is a resident of the State of New York, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

170.    Plaintiff MIGUEL TORRES, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

171.    Plaintiff THOMAS TRIPOULAS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

172.    Plaintiff NELLIE TROIANO, is a resident of the State of Pennsylvania, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

173.    Plaintiff STEVEN TROSTEN, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

174.    Plaintiff THOMAS TRZASKA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

175.    Plaintiff CYRIL TYSON, is a resident of the State of Georgia, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

176.    Plaintiff ROSA VALDEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

177.    Plaintiff GISELA VALENCIA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

178.    Plaintiff FRANCISCO VAZQUEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

179.    Plaintiff KATTIA VAZQUEZ, is a resident of the State of New Jersey, and brings this action on her own behalf and is entitled to recover damages on the causes of action set forth herein.

180.    Plaintiff PETER VAZQUEZ, is a resident of the State of New Jersey, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

181.    Plaintiff MYRIAM VEGA, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

182.    Plaintiff LUCRECIA VELEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

183.    Plaintiff WILLIAM VELEZ, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

184.    Plaintiff LOUIS VENA, is a resident of the State of South Carolina, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

185.    Plaintiff ROBERT J. VERHELST, is a resident of the State of Wisconsin, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

186.    Plaintiff MICHAEL VITALE, is a resident of the State of Delaware, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

187.    Plaintiff ANDREW VITIELLO, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

188.    Plaintiff DEBRA WAGNER, is a resident of the State of Maine, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

189.    Plaintiff CHARLES WALSH, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

190.    Plaintiff GEORGE WARE, is a resident of the State of New Jersey, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

191.    Plaintiff JOHN WARREN, is a resident of the State of Kentucky, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

192.    Plaintiff ANCIL WATSON, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

20

193. Plaintiff STACY WEISS, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

194. Plaintiff THEOPHILUS WELLS III, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

195. Plaintiff DELORES WILLIAMS, is a resident of the State of New Jersey, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

196. Plaintiff ALLEGRA WILSON, is a resident of the State of Georgia, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

197. Plaintiff JEAN WINTER, is a resident of the State of New York, and brings this action on her own behalf and in her capacity as the Personal Representative for the Estate of Richard Winter, Deceased, and is entitled to recover damages on the causes of action set forth herein.

198. Plaintiff ROBERT WOLF, is a resident of the State of New York, and brings this action on his own behalf and in his capacity as the Personal Representative for the Estate of Kenneth Wolf, Deceased, and is entitled to recover damages on the causes of action set forth herein.

199. Plaintiff MATILDE YAMASQUI, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

200. Plaintiff JOSEPH E. YOUNG, is a resident of the State of New Jersey, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

201. Plaintiff VINCENT ZAPPULLA, is a resident of the State of New Jersey, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

202. Plaintiff JAMES ZOCCOLI, is a resident of the State of New York, and brings this action on his own behalf and is entitled to recover damages on the causes of action set forth herein.

## DEFENDANTS

203.    Defendant Kingdom of Saudi Arabia ("KSA" or "Saudi Arabia") is a foreign state within the meaning of 28 U.S.C. § 1391(f). Saudi Arabia maintains an Interest Section within the United States at Royal Embassy of Saudi Arabia, 601 New Hampshire Avenue, NW Washington, DC 20037.

204.    Defendant Saudi Binladin Group ("SBG") is a Saudi Arabia-based company with a principal place of business located in Jeddah, Saudi Arabia. It was created by Osama Bin Laden and nineteen of his brothers in 1989. It is a closely held conglomerate with operations worldwide.

205.    Defendant Mohamed Binladin Company ("MBC") is a Saudi Arabia-based company with a principal place of business located in Jeddah, Saudi Arabia. It was created by Osama Bin Laden and 59 other members of his family. It performs construction and other work largely in the Middle East.

206.    Defendant Mohamed Binladin Organization ("MBO") is a Saudi Arabia-based company with a principal place of business located in Jeddah, Saudi Arabia. It grew out of the business activities of the patriarch of the Binladin family, Mohamed Binladin over the past century. It was reorganized into SBG and MBC in 1989.

207.    Defendant Prince Mohamed Bin Faisal al Saud ("Prince Mohamed") is a Saudi Arabia-based businessman and banker with his principal place of business in Jeddah, Saudi Arabia. Prince Mohamed is a senior member of the Saudi Royal Family and has specialized in the field of Islamic Banking. He has multiple business connections to Defendant Yasin Kadi.

208.    Defendant National Commercial Bank ("NCB") is a Saudi Arabia-based international financial institution, with a principal place of business located at King Abdul Aziz Street, Jeddah, Saudi Arabia. NCB is a large Saudi bank that has long provided soft loans to members of the Saudi Royal Family. NCB has multiple business ties to Defendant Yasin Kadi.

22

209.    Defendant Yasin Kadi ("Kadi") is a Saudi Arabia-based businessman and charity manager with his principal place of business in Jeddah, Saudi Arabia. Kadi had business activities in Pakistan, Sudan, Turkey, Albania and numerous other countries. Yasin Kadi was declared an Executive Order 13224 Specially Designated Global Terrorist ("SDGT") by the U.S. government for his support to al Qaeda.

210.    Defendant Muslim World League ("MWL") is a Saudi Arabia-based charitable organization with its principal place of business in Mecca, Saudi Arabia. It was founded in 1962 largely by members of the Muslim Brotherhood and acts as a proselytizing organization. It is the parent of Defendant URO.

211.    Defendant International Islamic Relief Organization ("IIRO") is a Saudi Arabia-based charitable organization with its principal place of business in Jeddah, Saudi Arabia. IIRO provides emergency relief assistance in Muslim countries worldwide as well as undertakes proselytizing activity. It is often co-located with its parent the MWL. At least two offices of the IIRO and a senior official have been declared SDGTs by the U.S. government for their support to al Qaeda.

212.    Defendant World Assembly of Muslim Youth ("WAMY") is a Saudi Arabia-based charitable organization with its principal place of business in Riyadh, Saudi Arabia. WAMY is a proselytizing organization for the ultra conservative version of Islam known as Wahhabism. WAMY focuses on radicalizing youth via educational facilities and youth camps

213.    Defendant Al Haramain Islamic Foundation ("al Haramain") is a Saudi Arabia based charitable organization with its principal place of business in Riyadh, Saudi Arabia. Al Haramain is closely affiliated with the Kingdom of Saudi Arabia 's Ministry of Islamic Affairs. All branches as well as senior officials have been declared SDGTs for their support to al Qaeda.

214.    Defendant AI Rajhi Bank ("AI Rajhi Bank"), formerly known as al Rajhi Banking and Investment Company, is a Saudi Arabia-based international financial institution with a principal place of business located at Olaya Street, Riyadh, Saudi Arabia. Al Rajhi Bank was the first Saudi bank to be licensed as an Islamic bank.

215.    Defendant Dubai Islamic Bank ("DIB") is a United Arab Emirates-based financial institution with its principal place of business in Dubai, UAE.

216.    Defendant DALLAH AVCO TRANS ARABIA, aka Dallah Avco, is a Saudi Arabia-based company with a principal place of business in Jeddah, Saudi Arabia. Dallah Avco is a subsidiary of Dallah al Baraka, a Saudi conglomerate owned by Saleh Kamel. Dallah Avco operates largely in the field of aviation and is a major contractor to the Saudi aviation industry under the Ministry of Defense.

## JURISDICTION

217.    Jurisdiction exists pursuant to 28 U.S.C. §1331 (federal question); 28.U.S.C. § 1605A (the Foreign Sovereign Immunities Act); 28 U.S.C. § 1330(a), 1331 and 1332(a)(2), 18 U.S.C. § 2388, 28 U.S.C. § 1350 ("Alien Tort Act"), and the Torture Victim Protection Act, PL 102-256,106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (West 1993) and The Justice Against Sponsors of Terrorism Act.

218.    Venue is proper in this district pursuant to the Air Transportation Safety and System Stabilization Act, (Pub. Law 107-42, 115 Stat. 230), 49 U.S.C. §40101, Title IV, §408(b)(3), designating the Southern District of New York ("S.D.N.Y.") as the exclusive venue for all civil litigation arising out of, or related to the September 11th Attacks, and 28 U.S.C. 1391(b)(2) and 1391(f)(1) because a substantial number of acts, occurrences, and damages giving rise to the claims occurred in the Southern District of New York.

## NATURE OF THE ACTION

219.    This lawsuit is for recovery of damages suffered by individuals as a result of the September 11, 2001 terrorist attacks upon the United States. The claims are based upon the activities of the Defendants comprised of the Kingdom of Saudi Arabia along with certain Charities and Banks that have funded  Al Qaeda's activities in in the years leading up to the September 11, 2001 terrorist attacks through which the defendants aided and abetted those attacks and conspired with al Qaeda in relation to same, as well as defendants' own related acts of international terrorism, involving violations of the Anti-Terrorism Act ("ATA"), 18 U.S.C. §2331 et seq. *See e.g.* 18 U.S.C. §§2339A, 2339B, 2339C and the Justice against Sponsors of Terrorism Act. The Defendants are civilly liable to the Plaintiffs for the injuries they sustained as a result of their actions in support of of al Qaeda and the September 11, 2001 terrorist attacks as described herein pursuant to §2333 of the ATA and the Justice Against Sponsors of Terrorism Act.

## FACTUAL BACKGROUND

220.    On the morning of September 11, 2001, two hijackers, Abdula Aziz Al Omari, and Mohammed Atta, arrived at an airport in Portland, Maine.

221.    Atta and Omari boarded a 6:00 AM flight heading to Boston's Logan International Airport from Portland.

222.    Upon arriving in Boston at approximately 6:45 AM, Atta and Omari were joined by fellow colleagues Satam Al Suqami, Wail al Shehri, and Waleed al Shehri (the "Shehri brothers").

223.    The five of them then boarded American Airlines Flight 11 bound for Los Angeles from Boston's Logan International Airport. This flight was scheduled to depart at 7:45 AM.

224.    At approximately the same time, five other hijackers: Marwan al Shehhi, Fayes Banihammad, Mohand al Shehri, Ahmed al Ghamdi, and Hamza al Ghamdi boarded United Airlines flight 175 at the same Boston airport also bound for Los Angeles.

225.    In spite of being randomly selected by CAPPS (Computer Assisted Passenger Prescreening System) Atta, Omari, Suqami, and the Shehri brothers were still able to clear their security checkpoints and were permitted to board their flights.

226.    Atta, Omari, Suqami took their seats in business class seats 8D, 8G and 10B. The Shehri brothers had adjacent seats in row 2 (Wail in 2A, Waleed in 2B), in the first-class cabin. They boarded American Airline Flight 11 between 7:31 AM and 7:40 AM. The aircraft pushed back from the gate at 7:40 AM.

227.    On United Airlines Flight 175, Banihammad took a seat in 2A, Shehri took a seat in 2B, Shehhi sat in 6C, Hamza al Ghamdi in 9C, and Ahmed al Ghamdi in 9D. This flight pushed from the gate at 8:00 AM.

228.    At approximately 7:15 AM, in the Virginia suburbs of Washington, D.C. five other hijackers were preparing to board an early morning flight. These were Khalid al Mihdhar, Majed Moqed, Hani Hanjour, Nawaf al Hazmi and Salem al Hazmi (the "Hazmi brothers").This was American Airlines Flight 77 departing from Washington Dulles International Airport heading towards Los Angeles.

229.    Mihdhar and Moqed both set off the first metal detector screenings as they passed through it, and they were directed to a second metal detector.

230.    Despite being selected by CAPPS, and being halted by the extra scrutiny exercised by the airline's customer service staff, the hijackers still managed to clear their security checkpoints and were permitted to board their flights.

231.    Moqed and Mihdhar boarded their United Airlines flight 77 at 7:50 AM and sat in seats 12A and 12B in coach. Hanjour was assigned to seat 1B in first class. The Hazmi brothers took seats in 5E and 5F in first-class.

232.   Between 7:03 and 7:39 AM, four other hijackers: Saeed al Ghamdi, Ahmed al Nami, Ahmad al Haznawi, and Ziad Jarrah checked in at Newark Airport to board United Airlines Flight 93 heading towards Los Angeles.

233.   All four passengers cleared their checkpoints and took seats in 1B, 3C, 3D and 6B in the first-class cabin.

**Plane #1: American Airlines Flight 11**

234.   At approximately 7:59 AM, American Airlines flight 11 took off at 7:59 AM heading from Boston to Los Angeles.

235.   At approximately 8:15 AM, which was about the time the "Fasten Seatbelt" sign would have turned off signaling that flight attendants to prepare for cabin service, the hijacker passengers quickly took action to seize control of the plane.

236.   The hijackers used Mace, pepper spray, knives, and threats of a bomb to control the crowd and moved them towards the rear of the plane.

237.   The hijackers attacked the flight staff at the front of the plane and gained entry to the cockpit most using a key from one of the flight attendants.

238.    At approximately 8:25 AM a message from flight attendant, Amy Sweeney, was received by the American Flight Services Office in Boston stating that two flight attendants had been stabbed and a man in first class had his throat slashed...and that there was a bomb in the cockpit.

239.   At approximately 8:44 AM, Sweeney reported to Michael Woodward, a manager at American Flight Services Office in Boston that "We are in a rapid descent…we are all over the place….We are flying low. We are flying very, very low. We are flying way too low….Oh my God we are way too low." Then the phone call ended.

240.    At 8:46 AM, American Airlines Flight 11 crashed into the North Tower of the World Trade Center in New York City. All on board, along with an unknown number of people in the tower were killed instantly.

### Plane #2: United Airlines Flight 175

241.    At approximately 8:15 AM, just as American Airlines Flight 11 was being hijacked, United Airlines Flight 175 was just taking off from Logan Airport.

242.    Sometime between 8:42 AM and 8:46 AM, the hijackers aboard flight 175 took action to seize control of the plane. They used knives, Mace, and the threat of a bomb to control the crowd as reported by two passengers and a flight attendant.

243.    They stabbed members of the flight crew as well as both pilots. The eyewitness accounts of these came from calls made from passengers who had moved to the rear of the plane.

244.    At 8:51 AM there were reports that the flight had deviated from its assigned altitude at 31,000 feet and a minute later, New York air traffic controllers began making efforts to contact the aircraft, but all attempts were unsuccessful.

245.    At 8:58 AM, the flight was no longer on a flight path towards Los Angeles and was heading towards New York City.

246.    Five minutes later, at 9:03 AM, United Airlines Flight 175 struck the South Tower of the World Trade Center. All on board, along with an unknown number of people in the tower were killed instantly.

### Plane #3: American Airlines Flight 77

247.    At approximately 8:54 AM, American Airlines Flight 77 heading to Los Angeles from Washington Dulles began deviating off course, turning south.

248.    The hijackers on board used knives and box cutters to take control of the plane and controlled the other passengers to move towards the rear of the plane.

249.    At approximately 9:34 AM, the Ronald Reagan Washington National Airport advised the Secret Service of an unknown aircraft that was heading towards the White House. At this time flight 77 was approximately 5 miles west-southwest of the Pentagon.

250.    At approximately 9:37 AM, American Airlines Flight 77 crashed into the Pentagon, travelling at approximately 530 mph. All on board, as well as many civilians and military personnel in the building were killed.

### Plane #4: United Airlines Flight #93

251.    At approximately 8:42 AM, United Airlines Flight 93 took off from Newark Liberty International Airport in Newark, New Jersey bound for San Francisco.

252.    By 9:00 AM, the crashing of the first hijacked aircraft had become breaking news, and the FAA was facing the staggering realization of apparent multiple hijackings.

253.    At approximately 9:30 AM, the FAA's Cleveland Air Route Traffic Control Center overheard an announcement indicating that there was a bomb aboard the aircraft, and that the plane was returning to the airport.

254.    The hijackers aboard this aircraft had used knives and the threat of a bomb on board to control the passengers to move them towards the rear of the plane.

255.    At the rear of the plane, many passengers were dialing friends and family members to apprise them of the events taking place on the plane.

256.    Callers reported that a passenger had been stabbed and that two people were lying on the floor apparently injured or dead. Other reports stated that these two were the captain and the first officer. There was also a reporting of one dead flight attendant.

257.    At approximately 9:57 AM, the passengers on board began to assault the hijackers. There's one account of a caller from the rear of the plane stating "Everyone's running up to first class. I've got to go. Bye".

258.    The cockpit voice recorder recorded sounds of the passenger assault muffled by the intervening cockpit door.

259.    In an effort to disrupt the passenger assault, Jarrah, the hijacker pilot began to roll the plan to the left and the right and also pitched the nose of the airplane up and down to disorient movement aboard the aircraft.

260.    At approximately 10:02 AM, there was recording of the sounds of a hijacker yelling "Allah is the greatest. Allah is the greatest" with the sounds of the passenger counter-attack continuing in the background, followed shortly by the sound of the aircraft crashing into an empty landfill in Shanksville, Pennsylvania at 580 mph.

261.    The total death toll included 265 people on the four planes (from which there were no survivors), 2,606 in the World Trade Center and in the surrounding area, and 125 at the Pentagon.

262.    Among those who perished on the day of September 11, 2001 were 343 firefighters, 72 law enforcement officers, 55 military personnel, and the 19 terrorists who died in the attacks.

**THE COLLAPSE OF THE TOWERS**

263.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

264.    The Twin Towers were designed as "test in tube" structures, which provided tenants with open floor plans uninterrupted by columns or walls. Numerous, closely spaced perimeter columns provided much of the strength to the structure, along with gravity load shared with the steel box columns of the core. Above the tenth floor, there were 59 perimeter columns along each face of the

building, and there were 47 heavier columns in the core. All of the elevators and stairwells were located in the core, leaving a large column-free space between the perimeter that was bridged by prefabricated floor trusses.

265.    The hijackers all boarded flights that were departing from the East Coast to the West Coast on the morning of September 11th, 2001.

266.    This ensured that each plane would have at least 10,000 gallons (38,000 L) of highly flammable jet fuel before takeoff.

267.    The light construction and hollow nature of the structure of the World Trade Center buildings would allow the jet fuel to penetrate far inside the towers, igniting many large fires simultaneously over a wide area of the impacted floors. The fuel from the planes burned at most for a few minutes, but the contents of the buildings burned over the next hour or hour and a half.

268.    The fires were hot enough to weaken the columns and cause the floors to sag, pulling perimeter columns inward and reducing their ability to support the mass of the building above.

269.    At 9:59 AM, approximately 56 minutes after it had been struck, the South Tower collapsed to the ground.

270.    After the South Tower collapsed, NYPD helicopters relayed information about the deteriorating conditions of the North Tower. At 10:20 AM, the NYPD aviation unit reported that "the top of the tower might be leaning", and a minute later reported after that the North Tower "is buckling on the southwest corner and leaning to the south".

271.    At 10:28 AM, the North Tower collapsed after burning for 102 minutes.

## THE DUST CLOUD

272. Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

273. As a result of the collapse of the World Trade Center from structural damage sustained in the attacks, the Twin Towers and Seven World Trade Center collapsed, spreading known and unknown toxic substances throughout the World Trade Center Site and the surrounding areas, in the Lower Manhattan Disaster Site.

274. Six million square feet of masonry, 5 million square feet of painted surfaces, 7 million square feet of flooring, 600,000 square feet of window glass, and 200 elevators pulverized into the giant cloud of World Trade Center dust ("WTC dust") when the towers collapsed.

275. The dust cloud spread along roadways, parking lots, and other ground areas in lower Manhattan that extended as far north as Canal Street, it spanned into parts of Brooklyn and the dust could be observed entering over the pier areas adjacent to the East River directly south-east of the World Trade Center area.

276. About 80-90% of the settled WTC dust was comprised of a highly alkaline mixture of crushed concrete, gypsum, synthetic vitreous fibers, fiberglass, glass, silica, benzene, lead, beryllium, volatile organic compounds, and respirable asbestos particles in amounts that were identified in a resuspended dust test to be 100-10,000 times higher than airborne asbestos concentrations in public buildings containing at least one area of damaged asbestos-containing materials.

277. High concentrations of coarse and super coarse WTC dust were inhaled and deposited in the conductive airways in the head and lungs, and subsequently swallowed, causing both physical and chemical irritation to the respiratory and gastroesophageal epithelia.

278. There were both acute and chronic adverse health affects in rescue/recovery workers; cleanup workers; residents; and office workers.

279.    Essentially, the collapse of the World Trade Cener Site and its aftermath had devastating consequences to the rescue and recovery workers, cleanup workers, residents, office workers and their families.

280.    The collapse of the World Trade Cener Site created a massive dust cloud of carcinogens comprised of burning jet fuel, fiberglass, metal, plastics, asbestos, construction material,  lead paint and other materials which turned lower Manahattan into a toxic bath of cancer and other deadly diseases.

281.    The Plaintiffs herein and their families have suffered immenslty both physically and mentally from the collapse of the World Trade Center site.

282.    The Plaintiffs herein have collectively suffered numerous health effects that have been medically linked to the exposure of hazardous airborne materials as a result of the events of September 11. These serious and permanent injuries include: acute traumatic injuries such as burns, complex sprains, eye injuries, fractures, head trauma, tendon tears; Aerodigestive disorders such as: Asthma, Chronic Cough Syndrome, Chronic laryngitis, Chronic nasopharyngitis, Chronic respiratory disorder due to fumes/vapors, Chronic rhinosinusitis, Gastroesophageal reflux disorder (GERD), Interstitial lung diseases, Reactive airway dysfunction Syndrome (RADS), Sleep apnea, Upper airway hyperactivity, and chronic obstructive pulmonary disorder (COPD); Mental Health Conditions: Acute Stress Disorder, Adjustment disorder, Anxiety disorder, Depression, Dysthymic disorder, Generalized anxiety disorder, Major Depressive disorder, Panic disorder, Post-Traumatic Stress Disorder (PTSD), Substance Abuse; Musculoskeletal Disorders: Carpal Tunnel Syndrome (CTS), Low back pain; Cancers: non-Hodgkin Lymphoma, Follicular non-Hodgkin lymphoma, Hodgkin's disease, Leukemia, Lymphoid Leukemia, Multiple Myeloma, Malignant Plasma Cell Neoplasms, Myeloid Leukemia, Malignant Neoplasm of the Lymphoid, Peripheral and cutaneous T-cell Lymphomas, Childhood Cancers, Malignant Neoplasm of the Breast, Malignant Neoplasm of the Ovary, Colon Cancer,

Malignant Neoplasm of the Esophagus, Liver Cancer, Rectal Cancer, Stomach Cancer, Eye Cancer, Tongue Cancer, Lip Cancer, Malignant Neoplasm of the Gum, Malignant Neoplasm of the Hypopharynx, Malignant Neoplasm of the Hypopharynx, Malignant Neoplasm of the Nasal Cavity, Malignant Neoplasm of the Nasopharynx, Malignant Neoplasm of the Oropharynx, Malignant Neoplasm of the Parotid gland, Malignant of the Tonsil, Lung Cancer, Heart Cancer, Brain Cancer, Bladder Cancer, Kidney Cancer, Prostate Cancer Malignant Neoplasm of the Ureter, Malignant Neoplasm of the Renal Pelvis, Malignant Neoplasm of other unspecified urinary organs, Malignant Neoplasm of the Scrotum, Skin Cancer. Mesothelioma, Malignant Neoplasm of the Peripheral Nerves and autonomic nervous systems, and any type of cancer that occurs in less than 15 cases per 100,000 persons per year in the United States (based on 2005-2009 average annual data age-adjusted to the 2000 U.S. population. There have also been reports of low birth weight and birth defects in children exposed *in utero*.

283.    The Plaintiffs are fearful for the injuries they may sustain in the future as many of the injuries that occur from a hazardous exposure such as the dust cloud are latent.

## OSAMA BIN LADEN AND THE 9/11 PLAN

284.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

285.    The plan to attack America with its own airplanes was an idea partially contrived by Osama Bin Laden. Osama Bin Laden was taught to hate Americans from childhood. He is quoted as saying, "Since I was a boy, I have been at war with and harboring hatred for the Americans."

286.    By 1982, bin Laden had made plans to launch attacks inside America. In another interview he was quoted saying, "when America permitted the Israelis to invade Lebanon and the American Sixth Fleet helped them….Houses destroyed along with their occupants and high rises

34

demolished….As I looked at those demolished towers in Lebanon, it entered my mind that we should punish the oppressor in kind and that we should destroy towers in America in order that they taste some of what we tasted."

287.    In or about 1989, Osama bin Laden, and others founded an international terrorist group that became known as "Al Qaeda" which is Arabic for "the base" or "the foundation".

288.    In 1989, shortly after the formation of al Qaeda in Pakistan and Afghanistan, bin Laden returned to Jeddah to help restructure his family business. While doing so, he also brought numerous veterans of his jihad (holy war) to Saudi Arabia, including members of al Qaeda.

289.    He hosted them, supported them materially and financially and directed some on to Yemen to initiate jihad there. These activities were not done in secret, but openly.

290.    According to the Final Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"):

> Bin Laden understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as "the Golden Chain", put together mainly by financiers in Saudi Arabia and Persian Gulf states. Donations flowed through charities and other nongovernmental organizations (NGOs). Bin Laden and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen or "holy warriors".

291.    In establishing Al Qaeda, Bin Laden's ultimate vision was to create a world-wide Islamic state with a multi-national Islamic army capable of directly challenging the US, China, Russia, and what he viewed as a world under Judeo-Christian and Confucian domination.

292.    The means by which these goals were to be accomplished were through terror, ethnic cleansing, and control over nuclear and biological weapons.

293.    After the invasion of Kuwait by Iraq in August 1990, bin Laden made a series of visits to senior members of the Saudi Royal Family offering to mobilize his veterans, many of which were already in Saudi Arabia. His anger against the Americans grew when the Saudi officials turned him down and instead invited the US forces into Saudi Arabia.

294.    From 1991 to 1993 bin Laden and al Qaeda issued a series of "fatwas" (legal lectures from an Islamic scholar on issues rooted in Islamic law) calling for attacks against the U.S. for its occupation of not only Saudi Arabia but Somalia as well.

295.    By late December 1992, with al Qaeda and himself in Sudan, his plans began coming to fruition when al Qaeda launched the first attacks on Americans in Aden, Yemen. Two bombs were set off at hotels frequented by US military. Within a few months, in internal documents, the U.S. government pointed fingers at bin Laden, and by March 1993, a major article in the New York Times stated that Yemeni officials were saying that bin Laden and his Afghan mujahideen were behind the terrorist attacks.

296.    Bin Laden did not desire secrecy. It was part of his strategy to launch high profile attacks against what he considered the biggest terrorist in the world, the United States. His objective was to generate ever larger numbers of young men to join his jihad and ever larger amounts of money to finance it. These objectives could not be accomplished with secrecy.

297.    According to the 9/11 Commission Report, "Plans to attack the United States were developed with unwavering single-mindedness throughout the 1990's."

## THE FUNDING OF THE 9/11 ATTACK

298.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

299.    The Al Qaeda organization required approximately $35 million annually to support its mission of global jihad and sustain the infrastructure required to implement the September 11th attacks.

300.    Al Qaeda was funded by various sources including the Kingdom of Saudi Arabia.

301.    Osama Bin Laden played a key role in orchestrating the flow of money that would ultimately be used to sponsor the 9/11 attack. According to one account from Zacarias Moussaoui, who was an employee for the highest levels of al Qaeda between 1998-2001 was quoted as stating the following:

> Q. Why would the ulema have a say in that process?
> A. Ulema, essentially they are the king maker. If – if the ulema say that you should not take power, you are not going to take power. And the ulema were important because they are the people who – who – who certify the Islamic legality of the jihad of Osama Bin Laden. So Nawaf, Sultan, all the prince, they were giving money, helping Osama Bin Laden so he known the – to get, let's say, favor, or especially not to get the – wrath of the ulema – the Wahhabi ulema.

302.    There are three components of the KSA that have been active with al Qaeda: the Ministries controlled by the Ulema (Arabic for "scholars" or "the learned ones"), the General Intelligence Directorate and the Royal Family.

303.    Osama Bin Laden came from a family that had developed close business relations with the King and other senior members of the al Saud Royal Family. Kings and Princes were familiar names and faces in the bin Laden household. It is not surprising therefore that the relationship would extend to supporting his call for jihad in Afghanistan.

304.    The Mohammed Binladin Organization ("MBO") was a set of businesses established by Mohammed bin Awd bin Laden, father of Osama. Following Mohammed's sudden death in 1967, King Faisal appointed trustees to oversee the organization.

305.    The Saudi Binladin Group ("SBG") and the Mohamed Binladin Company ("MBC") are family businesses founded and run by Osama bin Laden and his brothers, and an integral part of the al Qaeda support network from the terrorist group's founding. They provided assistance that was essential to establishing the network and capabilities that would ultimately carry out the September 11th Attacks. MBO, SBG, and MBC ("the Binladin Family Companies") have a complex nested structure that obscures any clear hierarchal organization.

306.    The Binladen Family Companies knew of Osama Bin Laden's anti-American stance from his childhood. The Binladin Family Companies were on notice that Osama Bin Laden wanted to launch attacks on U.S. soil from at least 1982 when he blamed the massacres in Lebanon on the United States.

307.    From 1989 up to and including the September 11th Attacks, the Binladin Family Companies actively supported Osama Bin Laden and al Qaeda with money and logistical support in a knowing and intentional effort to purposefully direct attacks at the United States.

308.    Osama Bin Laden received about a million dollars per year in support from his family starting in 1970, $20-25 million in all, much of it following the formation of al Qaeda.

309.    By 1990, Osama Bin Laden made his intentions to attack America clear by pronouncing at the family's own Jeddah mosque to an audience of hundreds that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them."

310.    Prince Mohamed, a business partner of Osama Bin Laden was engaged in the sponsorship of international terrorism through his ownership, control and supervision of Dar al Maal al Islam, the Islamic Investment Company of the Gulf, Faysal Islamic Bank of Bahrain, Faisal Finance (Switzerland) S.A., Faisal Finans Kurumu Turkey, al Faysal Investment Bank of Pakistan, The Faisal Islamic Bank Sudan, Tadamon Islamic Bank of Sudan and al Shamal Islamic Bank in the Sudan.

311. The following paragraphs demonstrate that Prince Mohamed knowingly and intentionally directed money to support Osama Bin laden and al Qaeda in support of their jihadist pledge to kill and harm Americans throughout the 1990s and up to and including the September 11, 2001 Terror Attacks.

312. Prince Mohamed is the brother of Prince Turki, the head of the GID, the Saudi Intelligence Service. At all relevant times, Prince Mohamed ran his banking and business operation from an office in Jeddah, Saudi Arabia.

313. From his position in the Saudi Royal Family and living and working in Jeddah, Saudi Arabia, Prince Mohamed would have been exposed to the pronouncements and activities of Osama Bin Laden. His personal knowledge of Osama Bin Laden and al Qaeda's activities in the Sudan gave him an insider's awareness of their violent anti-American terror activities. Prince Mohamed purposefully directed his actions in support of al-Qaeda at the United States via the following.

314. During the Afghan jihad, Prince Mohamed financed numerous charities which provided support to Osama Bin Laden, including the International Islamic Relief Organization.

315. Dar al Maal al Islami ("DMI") was founded in 1981 to foster the spread of Islamic banking.

316. DMI's board of Directors included a brother of Osama Bin Laden and Hasan Turabi the leader of the coup d'etat in Sudan which installed a radical Islamist movement in charge of the country. As noted above Turabi invited al Qaeda and Osama bin Laden to Sudan and hosted them from 1989 – 1996.

317. At all relevant times DMI held substantial investments in three Sudanese banks which have been active supporters of Osama Bin laden and al Qaeda; Faisal Islamic Bank Sudan, Tadamon Islamic Bank and al Shamal Islamic Bank.

318.     One of Prince Mohamed and Osama Bin Laden's investments was the al Shamal Islamic Bank ("al Shamal"). As reported by the State Department: "Bin laden and wealthy NIF members capitalized al-Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

319.     The National Commercial Bank ("NCB") was established in 1950 by Salim bin Mahfouz, father of Khalid bin Mahfouz.

320.     Khalid bin Mafouz became President and CEO of NCB, and its principal shareholder with control over more than 50% of the bank's capital. Khalid bin Mahfouz served as President and CEO of NCB until he was pushed out of that position by Saudi authorities in 1999.

321.     Throughout the 1980s and 1990s, NCB was closely related to, and often worked in collaboration with, the Bank of Credit and Commerce International ("BCCI"), a banking institution in which Khalid bin Mahfouz owned approximately 20% of the shares. The head of Saudi intelligence, Kamal Adham also held an ownership interest, and eventually pled guilty in Southern District of New York of charges related to fraud and was fined $105 million for violating US banking laws.

322.     One manner of NCB's support for al Qaeda was in providing financial services, including facilitating the surreptitious transfer of funds for many of al Qaeda's "charity" fronts, including the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), World Assembly of Muslim Youth ("WAMY"), the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), Al Haramain Islamic Foundation and the Muwafaq Foundation.

323.     Al Qaeda relied on these da'awa organizations (frequently described inaccurately as "charities") for funding. As the United Nations Security Council Committee explained:

> From its inception, al-Qaeda has relied heavily on charities and donations from its sympathizers to finance its activities. Charities provide al-Qaeda with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds

40

used for other legitimate humanitarian or social programs. Al-Qaeda supporters and financiers have also established front charity networks stem from the anti-Soviet Jihad in Afghanistan during the late 1980s. During that time, al-Qaeda could draw on a number of state-assisted charities and other deep pocket donors that supported the anti-Soviet cause.

Today, Al-Qaeda continues to rely heavily on those charities to facilitate and mask the collection and movement of funds.

324.    Al Qaeda's development into a global terrorist network was funded primarily by the money and other material support it received from the KSA and purported charities acting as agents and alter-egos of the government of the KSA, many of which worked with the Al Qaeda leadership during the Afghan jihad.

325.    According to estimates from the FBI, the total cost for September 11th attacks cost between $175,000 to $250,000. According to Director Mueller and Bureau documents, "the funding mechanism behind the conspiracy appears to center around Marwan al Shehhi and individuals providing financial support primarily" through the "banking and wire service infrastructure" of the United Arab Emirates.

326.    In July 2000, Atta and al Shehhi opened a joint account at Suntrust Bank in Venice, Florida, which received, according to the FBI four transfers from the United Arab Emirates ("UAE") totaling approximately $110,000 from Ali Abdul Aziz Ali using a variety of aliases.

327.    There was also an important flow of money back to the UAE immediately before September 11. FBI documents state that the funds "were returned to the source because the hijackers would not have wanted to die as thieves, therefore they returned the money that was provided to them."

328.    Three hijackers, including Atta and al Shehhi, sent funds to Mustafa Ahmed Alhawsawi in the UAE. Alhawsawi also had power of attorney over accounts of several hijackers in the UAE.

### THE KINGDOM OF SAUDI ARABIA "KSA" AS A SPONSOR OF TERRORISM

329.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

330.    The Kingdom of Saudi Arabia ("KSA") was built upon a general power sharing arrangement between the House of Saud, the Royal Family which holds political and financial authority and the religious power under the Ulema (religious leaders) led by the al Sheikh family named after their ancestor, Sheikh Mohamed Abdel Wahhabi founder of the sect now known as Wahhabism.

331.    The Kings and other senior Princes control the major governmental ministries and the lucrative opportunities presented by access to the oil revenue and the dispersal of government contracts for goods and services.

332.    Al Qaeda's ability to conduct large-scale terrorist attacks was the direct result of the support of Al Qaeda received from its material sponsors and supporters, primarily the Kingdom of Saudi Arabia ("KSA").

333.    Al Qaeda's development into a global terrorist network was funded primarily by the money and other material support it received from the Kingdom and purported charities acting as agents and alter-egos leadership during the Afghan jihad. These governmental agents served as the primary conduits for channeling financial, logistical, operational, and ideological support for Al Qaeda's global jihad for more than twenty years.

334.    Organizations described as Islamic da'awa organizations were created by the government of the Kingdom to propagate a radical strain of Islam throughout the World.

335.    Under the direction of the Saudi government, and especially the Kingdom's Ministry of Islamic Affairs, these organizations pressed the view that Western society, under the leadership of the

United States, is conducting a coordinated "Western Cultural Attack" on Islam, designed to destroy Muslim society as a predicate for Western conquest of Muslim territories.

336. These organizations believe that this so-called "Western Cultural Attack must be aggressively countered through jihad and worldwide indoctrination into Wahhabi Islam, a strategy the Kingdom promoted and implemented through government agencies, state controlled media, government sponsored publications, and a variety of other channels.

337. Beyond the massive financial sponsorship of Al Qaeda's global jihad, the Saudi government, through its agents, officials and purported charities, has been intimately involved in all aspects of Al Qaeda's operations including: (1) raising and laundering funds on behalf of Islamic terrorist organizations and associated separatist movements, including Al Qaeda; (2) channeling funds to Islamic terrorist organizations, fighters and associated separatist movements, including Al Qaeda; (3) providing financial and logistical support and physical assets to Islamic fighters and terrorists, including Al Qaeda; (4) aiding and abetting Al Qaeda's terrorist activities, including the planning, funding and execution of terrorist attacks; (5) permitting Islamic fighters and terrorists, including Al Qaeda members, to use ostensible employment with their organizations as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (6) serving as liaisons to localized terrorist organizations on behalf of Al Qaeda, thereby assisting Al Qaeda in expanding its operational base and sphere of influence; (7) funding and facilitating shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including Al Qaeda; (8) funding camps used by Al Qaeda and associated jihadist organizations to train soldiers and terrorists, including camps used to train the September 11th hijackers; (9) actively recruiting new members for Islamic terrorist organizations and associated separatist movements, including Al Qaeda; (10) working throughout the World to spread Al Qaeda's jihadist ideology and draw new adherents to its cause; (11) serving as channels for distributing

information and documentation within Islamic terrorist organizations and associated separatist movements, including Al Qaeda, and from Islamic terrorist organizations and associated separatist movements, including Al Qaeda, and from Islamic terrorist organizations and separatist movements to the media; (12) disseminating publications designed to advance Al Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (13) openly advocating for Muslims to take up arms against Western and democratic societies, including the United States.

338.    In 1996, Al Qaeda began planning and developing the September 11th Attacks. The initial plan was an adaptation of a component attack of the earlier "Bojinka" plot conceived by Khalid Mohammed and Ramzi Yousef ("Yousef") in 1994. Yousef's successful attack on the World Trade Center in 1993 inspired Khalid Mohammed to begin planning attacks against the United States.

339.    KSA sponsored terrorism in the United States by financially supporting certain officers and servicemen who were governmental agents and officials in an elaborate effort to coordinate terrorist plans and activities in the United States.

340.    One such official was Omar Ahmad Mustafa Al Bayoumi. Bayoumi was an employee of the Saudi Arabian government, and served as a Saudi intelligence agent responsible for monitoring the activities of Saudi citizens in the United States. Bayoumi was also an employee of the Saudi Arabian Presidency of Civil Aviation ("PCA"), a branch of the Saudi Ministry of Defense since the mid-1980's.

341.    In August 1994, Bayoumi moved to the United States at the direction of KSA where he enrolled in an ESL program (English as a Second Language) at San Diego State University.

342.    Bayoumi provided extensive and critical assistance to hijackers Hazmi and Mihdhar. Bayoumi's material support and assistance enabled Hazmi and Mihdhar to establish themselves in the United States and begin their operational preparations for the attacks.

44

343.    At all material times, Bayoumi was acting at the direction of the Saudi government and elements of the Ministry of Islamic Affairs in particular, in providing material support to the hijackers. As a top FBI official states, "We [the FBI] firmly believed that he [Bayoumi] had knowledge [of the 9/11 plot], and that his meeting with them [Hazmi and Mihdhar] that day was more than coincidence".

344.    Bayoumi was well known throughout the San Diego Muslim community, spending much of his time interacting with all of the regional mosques, including the Islamic Center of San Diego ("ICSD").

345.    During his initial year in San Diego, Bayoumi was granted provisions by the PCA to work as an employee of Dallah Avco Trans Arabia Company ("Dallah Avco") in Saudi Arabia. Dallah Avco, an aviation contractor, is a wholly-owned subsidiary of the Dallah al Baraka Group ("DBG") which is owned by wealthy Saudi businessman, Saleh Abdullah Kamel.

346.    DBG and Kamel directed tens of millions of dollars in funding to support Al Qaeda and other radical Islamic caused. Kamel has been publicly identifies on the "Golden Chain" as one of Al Qaeda's principal financiers.

347.    In its pre-9/11 investigation, the FBI identified Bayoumi as an agent of the Saudi government. The two hijackers, Hazmi and Mihdhar, moved in with Bayoumi and lived with his family until they were able to establish their own housing.

348.    Bayoumi recommended Hazmi and Mihdhar to the property manager of the Parkwood Apartments and appears as a co-signer and guarantor for them on their rental application. Bayoumi is further listed as the co-signor and guarantor on their lease agreement because they did not have established credit. When the real estate agent refused to take cash for a deposit on the apartment, Bayoumi helped Hazmi and Mihdhar open a bank account with a $9,000 deposit. According to the manager at the Parkwood Apartments, Bayoumi would occasionally pay the hijacker's rent.

349. Future 9/11 hijackers Hani Hanjour was also seen in Bayoumi's apartment at least twice in early 2000 according to witnesses.

350. Bayoumi's primary source of income originating from Saudi Arabia came from his employment with Dallah Avco. Although the project for which Bayoumi was allegedly hired was based in the Kingdom, Bayoumi showed up for work only once during the seven years he was receiving a salary from Dallah Avco.

351. Intelligence collected by the FBI demonstrates a deeply rooted relationship between the Saudi government and Bayoumi. According to an April 5, 2002 FBI report titled "Omar al Bayoumi, Employed by Dallah Al Baraka," the FBI obtained and analyzed Bayoumi's telephone records revealing extensive contacts between Bayoumi and Saudi officials in Washington, D.C. and Los Angeles particularly during the January-March 2000 timeframe when 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles and subsequently settled in San Diego with Bayoumi's assistance.

352. Telephone records indicate that Bayoumi made approximately 141 calls to Saudi officials in Washington, D.C. at the Saudi Arabian Royal Embassy, the Saudi Islamic Affairs Department, the Saudi Arabian Cultural Mission, the Saudi Arabian education Mission, and the Saudi National guard, Bayoumi also made approximately 34 calls to the Saudi Arabian Royal Consulate in Los Angeles.

353. The extent and pattern of these contacts are consistent with witness statements identifying Bayoumi as an agent of the Saudi government responsible for monitoring the activities of Saudi citizens living in the United States, a role in which he would have reported to the Islamic Affairs departments in the Kingdom's Embassies and Consulates.

354. Moreover, the U.S. Postal Service advised the FBI that on January 18, 2001, Bayoumi received a package at his San Diego apartment from the Saudi Arabian Royal Embassy, 601 New Hampshire Ave., N.W., Washington, D.C.

355.    In addition to supporting Bayoumi, KSA also materially supported Muhammad Jaber Hassan Fahiki, who served as the head of the Ministry of Islamic Affairs office in the Saudi Arabian Embassy in Berlin, Germany.

356.    Fakihi, who worked for the Ministry of Islamic Affairs in Riyadh following his graduation from the King Saud University in 1995, was assigned to head the Islamic Affairs office at the Saudi Embassy in Berlin in or around June 2000. Fakihi answered directly to the Saudi Minister of Islamic Affairs in Riyadh, Saleh bin Abdulaziz al Ashaikh.

357.    As a representative of the Saudi Embassy and Ministry of Islamic Affairs, Fakihi frequently attended the Al Nur Mosque in Berlin. The mosque was a notorious haven for Islamic extremists, often hosting Muslim clerics that preached intolerance of non-Muslims and justified violence in the name of defending Islam. Dr. Salem Rafei, a Lebanese cleric who ran the mosque, openly supported Palestinian suicide attacks and called Muslims to kill all unbelievers standing in the way of Islam. Documents containing the mosque's address were seized from individuals detained by Pakistani authorities who are alleged to have received military training at Al Qaeda camps in Afghanistan in 2001.

358.    Fakihi, himself an adherent to the most extreme teachings of Wahhabi ideology, advocated for the development of mosques across Europe and told his supporters in the Kingdom that his ultimate goal was to turn Berlin into an Islamic center for Eastern Europe. In June 2000, Fakihi wrote a letter to the Saudi Minister of Islamic Affairs, Saleh bin Abdulaziz al Ashaikh, proposing to turn the Al Nur Mosque into a center for Islamic missionary activity aimed at "ethnic European" populations in Eastern Europe.

359.    Fakihi, who planned to move his office to the Al Nur Mosque, proposed to carry the word of Islam to Poland, the Czech Republic and Hungary, the last of "which once belonged to the Islamic Caliphate under Ottoman Empire rule".

47

360.  Hijacker, Mohammad Atta, was seen visiting the mosque and meeting with Fakihi.

361.  Fakihi confessed to his interrogators that he in fact transferred Saudi Embassy funds to certain charities, mosques, and other recipients per the instructions he received from Al Qaeda loyalists and "close friends" of Osama bin Laden. U.S. officials' familiar with the Saudi investigation claim that Fakihi was "more than just a sympathizer of bin Laden" and was "organizationally involved" with bin laden's Al Qaeda network. Saudi investigators reportedly reviewed some $800,000 in funds that were doled out by the Saudi Embassy's Ministry of Islamic Affairs office while under Fakihi's leadership.

362.  As further evidence of the depth of the Ministry of Islamic Affairs' ties to terrorist movements, including Al Qaeda, came to light in the wake of the September 11th attacks, the United States and other governments directly targeted the Ministry and officials of the Ministry in a series of counter-terrorism initiatives.

363.  In December 2003, the State Department deported and revoked the visas of approximately sixteen (16) individuals who were using their diplomatic status as representatives of the Saudi Embassy in Washington D.C. to promote and spread the radical and extremist Wahhabi ideology in the United States.

364.  The group included Jaafar Idris, an influential cleric who worked out of the Ministry of Islamic Affairs office in the Saudi Embassy, who from his position at the Embassy worked extensively with Fairfax, VA-based institute for Islamic and Arabic Sciences in America ("IIAS"), to promote extremist Wahhabi propaganda via student lectures and textbooks.

365.  IIAS, fully funded by the Saudi government, was operating as a satellite campus of the Imam Muhammad Bin Saudi Islamic University ("Imam U") in Riyadh, Saudi Arabia. Imam U is part of the KSA's Ministry of Higher Education.

366.  Ambassador Prince Bandar bin Sultan bin Abdul Aziz al Saud acted as the Chairman of IIAS's Board of Trustees.

367.	Idris, who was well-known in Islamic radical circles, was president of American Open University in Alexandria, VA, and further founded the Islamic Foundation of America in Springfield, VA, which operated a school, a mosque, and a prison-outreach program. According to U.S. government sources, the Foundation's offices was regularly visited by celebrated Islamic extremists, including Siraj Wahhaj, a New York imam who was identified as an unindicted conspirator in the 1993 World Trade Center bombing.

368.	The State Department's actions coincided with investigations conducted by the Internal Revenue Services and Senate Finance Committee into IIAS and its links to terrorist groups, forcing the Saudi government to end its sponsorship of the school.

369.	In a January 29, 2004 letter to then Secretary of State Colin L. Powell, Senator Charles Schumer urged the State Department to follow up its decision to revoke the visas of the Saudi officials and increase pressure on the Saudi government "to shut down the Islamic Affairs sections at their American diplomatic posts and to cease funding the Institute for Islamic and Arabic Sciences (IIAS)."

370.	According to Senator Schumer, "the Saudis continue to sponsor and promote the spread of religious extremism in the U.S.," particularly the Islamic Affairs offices which "supply textbooks to Muslim schools in the U.S. that promote an intolerant Wahhabi line."

371.	In late June 2004, dozens of federal agents connected to the FBI, Bureau of Immigration and Customs, and the IRS raided and searched IIAS as part of the U.S. government's on-going investigation into the school's links to radical Islam.

372.	Under pressure from the United States, the Saudis themselves ultimately acknowledged the depth of the problem regarding the radical and extremist teachings of the Saudi-educated clerics connected to the Ministry of Islamic Affairs, albeit only after Al Qaeda carried out attacks within the Kingdom itself in 2003.

**THE SAUDI BINLADIN GROUP ("SBG"); THE MOHAMED BINLADIN COMPANY ("MBC"); AND THE MOHAMED BINLADIN ORGANIZATION ("MBG"): COLLECTIVELY ("THE BINLADIN BUSINESSES") AS A SPONSOR OF TERRORISM**

373.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

374.    The Saudi Binladin Group ("SBG") is a Saudi Arabia-based company initially created by Osama Bin Laden and nineteen of his brothers in 1989. It is a closely held conglomerate with operations worldwide.

375.    The Mohammed Binladin Organization ("MBO") was a business established by Mohammed bin Awad bin Laden, father of Osama bin Laden. King Faisal appointed trustees to oversee the organization following Mohammed Binladin's death in 1967.

376.    The Saudi Binladin Group ("SBG") and the Mohamed Binladin Company ("MBC"), are family businesses that were founded and run by Osama bin Laden and his brothers.  These businesses played a material part of the al Qaeda support network.

377.    MBO, SBG and MBC ("The Binladin businesses") provided assistance that was essential to establishing al Qaeda's network capabilities and provided monetary and logistical support for the attacks on the United States on September 11, 2001.

378.    The Binladin businesses knew of Osama Bin Laden's desire to attack the United States.

379.    Osama bin Laden returned to Saudi Arabia from Afghanistan in 1989 to assist in the reorganization of the Binladin businesses.

380.    When Osama bin Laden left Saudi Arabia in May 1991 the Binladin businesses continued to pay him from private Swiss bank accounts as well as an offshore corporation hidden in the Cayman Islands.

381.    Osama bin Laden used the money he received from the Binladin businesses to support the al Qaeda training camps and to finance terrorist attacks in Yemen in 1992, Somalia in 1993 and in the United States on September 11, 2001.

382.    Osama bin Laden moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises which eventually encompassed numerous companies and a global network of bank accounts and nongovernmental institutions.

383.    Al Qaeda finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes.

384.    A former al Qaeda member Jamal al Fadl testified in 2001 at the U.S. Embassy bombing trial that Osama bin Laden told his al Qaeda associates in 1993 that the American army has come to Africa "and we have to stop the head of the snake. … He said that the snake is America, and we have to stop them. We have to cut the head and stop them".

385.    The Binladin businesses continued to knowingly provide significant support to Osama bin Laden and al Qaeda in support of their terrorist activities.

386.    Documents found in May 2011 in Abbottabad, Pakistan during the raid on Osama bin Laden's compound demonstrate that the Binladin businesses and the Binladin family members had direct written contact with Osama bin Laden.

387.    Documents show that the Binladin businesses gave at least $12 million to Osama bin Laden.

388.    Secretary Hillary Clinton has warned in a December 30, 2009 diplomatic cable originating from her office titled Terrorist Finance: Action Request for Senior Level Engagement on Terrorism Finance that "donors in Saudi Arabia constitute the most significant funding to Sunni terrorist groups worldwide." She went on to say that "organizations such as the International Islamic

Relief Organization (IIRO), Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY)… continue to send money overseas and, at times, fund extremism overseas."

389.   The International Islamic Relief Organization ("IIRO") was founded in 1979 and affiliated with the Muslim World League ("MWL").

390.   IIRO and MWL played significant roles in the founding and funding of al Qaeda.

391.   Al Qaeda members purchased weapons via the IIRO office.

392.   Hani Hanjour, one of the airplane hijackers on September 11, 2001 worked for the IIRO.

393.   According to Jamal al Fadl, a former al Qaeda official who became an informant for the United States, the IIRO provided false identification cards to al Qaeda members to enable them to cross the Pakistan-Afghanistan border for training at al Qaeda camps.

394.   Abu Hamam, a cousin of Osama bin Laden ran the IIRO office in Pakistan and was part of the financial infrastructure of al Qaeda. Abu Hamam transferred IIRO money to al Qaeda financial manager Madani al Tayyib, who then distributed money to individuals who were in charge of salary, travel, and health benefits for al Qaeda members.

395.   A 1996 CIA report on extremist charities noted that the IIRO was connected to Ramzi Yousef and Osama bin Laden stating: "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin….IIRO helps fund six militant training camps in Afghanistan,".

396.   A United States Department cable of April 2004 stated that the IIRO is "tied to al Qaeda and other terrorist organizations. For example, IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime. IIRO has also been cited as the conduit for funds from Usama bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by bin Laden to Mohamed Jamal Khalifa through IIRO.

397.    In August, 2006, the United States Department of Treasury stated: Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia. Al-Mujil has been called the "million dollar man" for supporting Islamic militant groups. Al-Mujil provided donor funds directly to al Qaeda… Al Mujil was also present in Afghanistan in the late 1990s and personally knew Osama Bin Ladin and deceased al Qaeda co-founder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990's, Al-Mujil established a relationship with senior al Qaeda operational planner Khalid Shaykh Muhammad.

## PRINCE MOHAMED BIN FAISAL AL SAUD AS A SPONSOR OF TERRORISM

398.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

399.    Defendant Prince Mohamed Bin Faisal al Saud ("Prince Mohamed") is a Saudi Arabia-based businessman and banker with his principal place of business in Jeddah, Saudi Arabia. Prince Mohamed is a senior member of the Saudi Royal Family and has specialized in the field of Islamic Banking. He has multiple business connections to Defendant Yasin Kadi.

400.    Prince Mohamed was a known business partner of Osama Bin Laden and was engaged in the sponsorship of international terrorism through his ownership, control and supervision of Dar al Maal al Islami, the Islamic Investment Company of the Gulf, Faysal Islamic Bank of Bahrain, Faisal Finance (Switzerland) S.A., Faisal Finans Kurumu Turkey, al Faysal Investment Bank of Pakistan, the Faisal Islamic Bank Sudan, Tadamon Islamic Bank of Sudan and al Shamal Islamic Bank in the Sudan.

401.    Prince Mohamed is the brother of Prince Turki, the head of the General Intelligence Directorate, ("GID"), the Saudi Intelligence Service. The GID is a separate intelligence agency that operates under the Ministry of the Interior.

402.    At all relevant times, Prince Mohamed ran his banking and business operation from an office in Jeddah, Saudi Arabia.

403.    From his position in the Saudi Royal Family and living and working in Jeddah, Saudi Arabia, Prince Mohamed would have been exposed to the pronouncements and activities of Osama Bin Laden. His personal knowledge of Osama Bin Laden and al Qaeda's activities in the Sudan gave him an insider's awareness of their violent anti-American terror activities. Prince Mohamed purposefully directed his action in support of al Qaeda at the United States.

404.    Dar al Maal al Islami ("DMI") was founded in 1981 to foster the spread of Islamic banking. During the Afghan jihad, Prince Mohamed financed numerous charities which provided support to Osama Bin Laden, including the International Islamic Relief Organization.

405.    DMI's Board of Directors included a brother of Osama Bin Laden and Hasan Turabi, the leader of the coup d'etat in Sudan which installed a radical Islamist movement in charge of the country.

406.    At all relevant times DMI held substantial investments in three Sudanese banks which have been active supporters of Osama Bin Laden and al Qaeda; Faisal Islamic Bank Sudan, Tadamon Islamic Bank and al Shamal Islamic Barile.

407.    One of Prince Mohamed and Osama Bin laden's investments was the al Shamal Islamic Bank ("al Shamal"). As reported by the State Department: "Bin Laden and other wealthy investors of the National Islamic Front ("NIF") capitalized al-Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank".

408.    The NIF members led a coup d'etat and seized power in Sudan in 1989. The Al Shamal Islamic Bank was founded in 1983 but did not begin doing business until 1990 after the NIF coup d'etat. The original shareholders during the 1980's were two Sudanese banks affiliated with Prince

Mohamed, National Islamic Front companies, Saleh Kamel, a Saudi businessman and banker, Kamel's companies, the Dubai Islamic Bank and others.

409.    In 1991 the Sudanese finance minister, Abdul Rahim Hamdi, formerly an employee of Saleh Kamel's bank, organized a business conference in Khartoum to promote investment in al Shamal Bank.

410.    Prince Mohamed, Yasin Kadi, Saleh Kamel, and other representatives of al Rajhi Bank attended the conference. Osama Bin Laden and other members of al Qaeda also attended. The conference resulted in a large investment in al Shamal on behalf of Prince Mohamed, Saleh Kamel, Yasin Kadi and Osama Bin Laden.

411.    Al Shamal General manager, Mohammed S. Mohammad, acknowledged that Osama Bin Laden has three corporate accounts in the bank, two opened on March 30, 1992 in the name of al Hijrah Construction and Development Co. Ltd and one opened in 1993 by Wadi al Aqiq, the mail al Qaeda holding company. Wadi al Aqiq and al Shamal Bank were also involved in joint venture business activities.

412.    Jamal Ahmed Al Fadl ("Al Fadl"), a former member of al Qaeda and the NIF was the first person called in the trial related to the 1998 bombings of the American Embassies in Kenya and Tanzania. Al Fadl whose role in al Qaeda included working in many of its business operations testified, that Osama Bin Laden and at least six al Qaeda operatives held bank accounts in al Shamal under their real names.

413.    Jamal Al Fadl testified that al Qaeda operatives received monthly checks of several hundred dollars from al Shamal accounts and that he transferred $100,000.00 from al Shamal accounts to an al Qaeda representative in Jordan.

414.    Faisal Islamic Bank Sudan was one of the founders of al Shamal in the 1980s and became a member of the board in July 1988. Hasan Turabi, the leader of the NIF and DMI board

member maintained his private office in the penthouse of the Faisal Islamic Bank building in Khartoum. Another director was Abdullah Naseef, the head of the Saudi-based International Islamic Relief Organization ("IIRO"), host of a founding meeting of al Qaeda and a personal friend of Prince Mohamed.

415.    Faisal Islamic Bank Sudan was also implicated as an al Qaeda sponsor during the 2001 United States trial on the 1998 Embassy bombings in Africa as managing bank accounts for al Qaeda operatives. Faisal Islamic Bank also provided banking services to defendant Yasin Kadi and one of al Qaeda's charities, the Muwafaq Foundation.

416.    The Tadamon Islamic Bank was one of the founders of al Shamal in the 1980s and became a member of the board in July 1988. Shareholders of the Tadamon Islamic Bank included Saleh Kamel and Faisal Islamic Bank Sudan. Tadamon also provided banking services to defendant Yasin Kadi and one of al Qaeda's charities, the Muwafaq Foundation.

417.    Tadamon Islamic Bank was also implicated as an al Qaeda sponsor during the 2001 United States trial on the 1998 Embassy bombings in Africa as managing bank accounts for al Qaeda operatives, in particular the accounts used to support the travel of Osama Bin Laden.

418.    Rowad Development, a Sudan-based agricultural company owned by Yasin Kadi, al Qaeda, al Shamal and others held its corporate meeting at al Shamal Bank. In Rowad's corporate records several of the shareholders including al Qaeda's holding company, Wadi al Aqiq cited al Shamal's address as their own.

419.    The Benevolence International Foundation ("BIF") aka al Bir held accounts at al Shamal Bank from 1991 until 2002. BIF's founder, Adel Batterjee, despite any prior bank management experience became the chariman of al Shamal. BIF and Batterjee were declared by Executive Order 13224 to be Specially Desginated Global Terrorist ("SDGT") by the U.S. government for their support to al Qaeda.

420.    In 1993, al Qaeda paid $210,000.00 for an airplane in Tucson, Arizona, that was then flown to Khartoum, Sudan. The funds were transferred to the United States from an account at al Shamal Bank. This plane was intended to transport American stinger aircraft missiles from Pakistan to Sudan and al Qaeda for future attacks.

421.    Even after Bin Laden left Sudan, al Shamal supported al Qaeda. According to the US State Department's annual report, Pattern of Global Terrorism, right up to September 11, 2001 Sudan allowed al Qaeda to provide financial and logistical support from its Sudanese base to other al Qaeda cells worldwide.

422.    Prince Mohamed and defendant Yasin Kadi have long running personal and business ties. Kadi's father-in-law held a senior position at several of Prince Mohamed's financial institutions. Kadi first held accounts at Prince Mohamed's Islamic Investment Company of the Gulf ("IICG"). The head of Prince Mohamed's private office then steered Kadi to Faisal Finance Switzerland, a subsidiary of Prince Mohamed's DML. By the mid 1990's this was the single largest depositor/investor in Faisal Finance Switzerland.

423.    At DMI's request in 1994 Kadi also invested in Prince Mohamed's al Faysal Investment Bank of Pakistan. By 1998, Kadi's investment had disappeared into Pakistan dwindling to near nothing. To recompense Kadi, Prince Mohamed organized a scheme by which Kadi purchased some of the shares at a low price and sell them back to DMI at a 50% premium six months later. DMI's shares were not traded on the open market and the buying and selling prices was set by Prince Mohamed. Kadi bought his DMI shares from a Saudi Prince, who was cousin and brother-in-law of the King of Saudi Arabia.

424.    As part of a Swiss investigation, the DMI compliance officer told the Swiss police that the change in ownership of the shares had never been registered, that it had been explained to him many times that al Qaeda originally was a charitable enterprise and were not necessarily terrorists. He

57

went on to say that Kadi as a shareholder was to support the DMI project, even though holding the DMI shares was not a good deal. DMI's compliance officer said that the whole Kadi shareholding affair was a mystery to him.

425.    This admission made clear that DMI was doing business with al Qaeda and that DMI shares were valuable to mask the investment being made in al Qaeda and not as a normal investment vehicle.

426.    In November 1997, the administrative assistant to Prince Mohamed sent a $2 million dollar check from Prince Mohamed's private office in Jeddah, Saudi Arabia to the Faisal Finance Switzerland account of Caravan, a Yasin Kadi company.

427.    Over the next six months Caravan transferred over $1 million to a Turkish company run by al Qaeda. The Turkish company later could not account to the Swiss police for how the funds were spent.

428.    In July 1999, Prince Mohamed in Jeddah sent $1 million to the Faisal Finance account of Caravan, a Yasin Kadi Company. Through a series of transactions, the funds ended up supporting al Qaeda Sudanese business activities.

429.    DMI's wholly owned subsidiary, Faisal Finance Switzerland held 23 accounts for Wael Jelaidan and Yasin Kadi. Swiss authorities froze these accounts in November 2001.

430.    In 1998, the FBI's Counter Terrorism Task Force identified a Faisal Finance account of Yasin Kadi as being a source of funding for Hamas terrorist, Mohamed Saleh. In 1999, Osama Bin Laden, on al Jazeera TV, acknowledged his close ties to Wael Jeladian. Nevertheless, Faisal Finance, knowingly and intentionally continued to provide numerous accounts to Wael Jelaidan and Yasin Kadi, as integral financial supporters of terror. The Hamas financing account identified in 1998 was one of the accounts frozen after September 11, 2001.

431.    In March 1993, Prince Mohamed's private office in Jeddah, Saudi Arabia sent $5 million to the Faisal Finance account of a Yasin Kadi company. Four days later, Kadi forwarded those funds to the Third World Relief Agency ("TWRA"). Two days later the TWRA forwarded the funds to another of their accounts.

432.    The Third World Relief Agency ("TWRA") was a Sudanese charity operating in the former Yugoslavia with close ties to al Qaeda. TWRA smuggled al Qaeda staff and weaponry into Bosnia during the civil war. Prince Salman, now King Salman personally transferred over $90 million dollars to TWRA and the Saudi High Commission under his name sent another $30 million.

433.    In 1993, some of the funds transited the Bank Austria account of Al Qaeda founder Wael Jelaidan and were sent on to a Pakistani weapons supplier paying for thousands of pieces of weaponry and ammunition. During the same transaction TWRA was engaged with this weapons supplier for the purchase of Cesium 137, a radioactive isotope and component of nuclear reactors and nuclear weapons. The U.S. government has stated that in 1993-1994 al Qaeda made an active effort to acquire the materials for a nuclear weapon.

434.    TWRA also held at least one account at Faisal Finance. A Sudanese senior office of Faisal Finance brought TWRA into Faisal Finance. Faisal Finance provided banking and investment services to TWRA for at least seven years. Millions of dollars were transferred through this account. In August 1993, there were transfers of $6 million from Kadi's Faisal Finance account to TWRA and $4 million from Wael Jelaidan to TWRA's Austrian account.

435.    There is no reasonable explanation for this circuitous route except to disguise the transfer of money for terrorist activity. Kadi, Jelaidan and TWRA are all known al Qaeda supporters.

436.    Prince Mohamed's Islamic Investment Company of the Gulf ("IICG") and Defendant, National Commercial Bank ("NCB") repeatedly sent to Yasin Kadi bearer's checks worth $1 million, $2 million, $5 million and $10 million. Over $50 million of bearer's checks were deposited into Kadi's

swiss accounts. At least some of the funds ended up in al Shamal Bank in Sudan. The Faisal Finance officials who handled the checks told Swiss authorities they did not know the origin of the funds. The checks were issued in Jeddah, Saudi Arabia and deposited in Geneva, Switzerland.

437.    There is no practical banking need for such a risky approach to handling these large sums of money. The only objective is to obscure the source of the funds. Money laundering is defined as the process by which criminally generated funds are made clean and usable. This is the opposite. The use of bearer's checks and nested corporations and charities has the intention to take clean money and turn it towards terror. It is termed money darkening.

438.    From 1991 – 2001, Prince Mohamed used nine entities in which he had an ownership interest or control to support al Qaeda. Prince Mohamed also was a direct supplier of funds to the al Qaeda sponsoring activities of Yasin Kadi. During this period Prince Mohamed was in a position to have private and public knowledge of the activities of Osama Bin laden in planning and carrying out terrorist attacks against the United States, including the September 11th attack.

## NATIONAL COMMERCIAL BANK AS A SPONSOR OF TERRORISM

439.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

440.    The National Commercial Bank ("NCB") was established in 1950 by Salim bin Mahfouz, father of Khalid bin Mahfouz.

441.    Khalid bin Mahfouz became President and CEO of NCB, and its principal shareholder with control over more than 50% of the bank's capital. Khalid bin Mahfouz served as President and CEO of NCB until he was pushed out of that position by Saudi authorities in 1999.

442.    Khalied Bin Mahfouz and the NCB have a long history with the Bin Laden family and specifically with Osama Bin Laden. Throughout the 1980s and early 90s, NCB worked closely with an organization known as the Bank of Credit and Commerce International ("BCCI"), a banking institution in which Khalid bin Mahfouz owned approximately 20% of the shares. The head of Saudi intelligence at that time, Kamal Adham also had an ownership interest, and eventually pled guilty in the Southern District of New York of charges related to fraud and was fined $105 million for violating US banking laws.

443.    Khalid bin Mahfouz has acknowledged making a $270,000 contribution to Osama Bin Laden in 1988 contemporaneous with the actions of BCCI and NCB in supporting terror. This is also contemporaneous with the establishment of al Qaeda.

444.    As mentioned earlier, NCB and Prince Mohamed's Islamic Investment Company of the Gulf ("IICG") repeatedly sent to Yasin Kadi bearer's checks worth $1 million, $2 million, $5 million and $10 million. Over $50 million of bearer's checks were deposited into Kadi's Swiss bank accounts. At least some of the funds ended up in al Shamal Bank in Sudan. The Faisal Finance officials who handled the checks told Swiss authorities they did not know the origin of the funds. The checks were issued in Jeddah, Saudi Arabia and hand carried and deposited in Geneva, Switzerland.

445.    Another manner of NCB's support for al Qaeda was in providing financial services, including facilitating the surreptitious transfer of funds for many of al Qaeda's "charity" fronts, including the Muslim World League ("MWL"), International Islamic Relief Committee for Kosovo and Chechnya ("SJRC"), Al Haramain Islamic foundation and the Muwafaq Foundation.

446.    The National Commercial Bank and Yasin Kadi 's actions and those of the Muwafaq Foundation and their businesses funded, aided and abetted and otherwise supported and give rise to a reasonable basis to believe that they have facilitated al Qaeda's activities to support their global jihad, and more specifically, their goal to attack Americans, particularly inside the United States.

447.    From the date of the Muwafaq Foundation's creation, NCB provided financial services and other support to facilitate Muwafaq's central role in advancing al Qaeda's jihad against the United States, serving as a conduit for wealthy Saudi businessmen to transfer funds to al Qaeda.

448.    Khalid bin Mahfouz hand-picked designated terror financier Kadi, with whom he maintained a "close personal relationship," to oversee the establishment and operation of the Muwafaq Foundation and NCB's Islamic Banking division.

449.    In 1998 an audit of NCB found that NCB Directors had established surreptitious banking facilities for several charitable organizations including Muwafaq and IIRO. Millions of dollars passed through these "facilities" as donations and loans without any internal or external oversight from the relevant bodies.

450.    The 2001 U.S. Treasury Department's Evidentiary Memorandum in Support of the Designation of Yasin Kadi pursuant to Executive Order 13224 stated:

> According to press accounts, in 1998, the Saudi government audited the Jeddah-based National Commercial Bank and found that $3 million in bank funds was funneled improperly to Muwafaq (aka Blessed Relief), which allegedly transferred the money to bin Laden.

451.    NCB held at least eight accounts for the Muslim World League.

452.    NCB held at least one account for Prince Mohamed Bin Faisal al Saud from which he supported the al Qaeda supporting activities of Yasin Kadi.

453.    NCB held at least fifteen accounts for Yasin Kadi.

454.    NCB held at least two accounts for the World Assembly of Muslim Youth.

455.    NCB held numerous accounts for the IIRO and its endowment fund Sanabel al Khair.

456.    NCB also held at least one account for the Osama Bin Laden Trust Fund.

457.    NCB opened two "shared accounts" with Al Rajhi Bank for the IIRO as a member of the SJRC, thereby allowing the SJRC to serve as a conduit for funneling donations to al Qaeda fighters in Kosovo and Chechnya.

458.    Given their prominent roles within al Qaeda's financial infrastructure, active participation in facilitating the sponsorship of al Qaeda, and personal involvement in the creation of charity platforms to support al Qaeda's operations, NCB officials Khalid bin Mahfouz and Yasin Kadi necessarily were aware through a variety of channels of the terrorist activities of the Muwafaq Foundation and IIRO at all relevant times.

459.    NCB was also placed on notice of the terrorist activities of the Muwafaq Foundation and IIRO through media reports and widely publicized governmental investigations.

## YASIN KADI AS A SPONSOR OF TERRORISM

460.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

461.    Yasin Kadi actively supported al Qaeda via his business activities that he used to transfer money to al Qaeda members in support of their plan to attack America. Yasin Kadi was past of the group of Saudi investors that met with Osama Bin Laden routinely and provided funds to al Shamal Islamic Bank.

462.    In 1997 and 1999, the Faisal Finance account of one of Kadi's companies received transfers of several million dollars from Prince Mohamed bin Faisal. Some of the funds were sent on to al Shamal Bank via the Dan Fodio account at Dubai Islamic Bank and the remainder disappeared into the coffers of a Lebanese owned company registered in Switzerland and Panama.

463.    According to the United Nations, "Bin Laden provided the working capital for up to five of Kadi's companies in Albania".

464.    Kadi's companies in Albania included Allintid, Caravan aka Karavan, Cavallo, Loks Hall aka Loxhall, and Medicare amongst others. All of Kadi's companies held accounts at the Arab Albanian Islamic Bank ("AAIB").

465.    The AAIB was founded in 1992 by Saudi investors including Prince Mohamed's Islamic Bank of Bahrain, Saleh Kamel's Dallah al Baraka and Yasin Kadi. These are the same investors who in the previous year joined Osama Bin Laden as investors in al Shamal Bank in Sudan.

466.    Throughout the time Kadi and bin Mahfouz were directing Muwafaq's operations, Kadi admits to having close relationships with senior al Qaeda officials, including founding al Qaeda member and close bin Laden associate Wael Jelaidan, who held senior leadership positions in the MWL, IIRO and SJRC and played a central role in the terrorist activities of those al Qaeda charity front organizations.

### THE MUSLIM WORLD LEAGUE ("MWL") AS A SPONSOR OF TERRORISM

467.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

468.    The Muslim World League ("MWL") is a charity with a presence in some thirty countries. The MWL has supported Osama Bin Laden and al Qaeda since the 1980s and the jihad against the Soviet invasion of Afghanistan. Two of Osama Bin Laden's closest allies Abdullah Azzam and Wael Jelaidan headed the office of the MWL in Peshawar, Pakistan.

469.    MWL publishes a journal which propagates the hard line Islamism called Wahhabism, the sect of Islam practiced in the Kingdom of Saudi Arabia. In 1992 at the beginning of the Bosnian civil war, the journal attempted to turn the conflict into a jihad and called for 'terrorizing 'the enemies of Islam.

470.    The MWL also played a role in supporting al Qaeda's 1998 bombing of the U.S. Embassies in Kenya and Tanzania. While working for the MWL in Kenya, Ihab Ali relayed messages between Osama Bin Laden in Afghanistan and his aide Wadi El Hage in Nairobi, Kenya in connection with the coordination of the bombings of the U.S. embassies.

471.    The MWL was part of the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"). The SJRC was created by the Kingdom of Saudi Arabia and also included WAMY, the IIRO, Saudi Red Crescent and other charity front organizations.

472.    MWL officials have publicly acknowledged that the organization's funds were being funneled to terrorist organizations. In an interview with Dr. Abdullah bin Saleh al Ubaid, Secretary General of the MWL, published in The Muslim World magazine on July 21 – 27, 1997, al Ubaid was asked about reports that the MWL's funds were being funneled to extremist groups. Al Ubaid responded: "this is a closed chapter …It has already been proven that there were people who exploited the situation and misused some funds…"

473.    Despite Dr. Ubaid's public admission, the State Department has made clear that:

> "It has been an on-going challenge to persuade Saudi officials to treat terrorism financing emanating for Saudi Arabia as a strategic priority." According to a December 30, 2009 diplomatic cable originating from Secretary of State Hillary Clinton's office, titled Terrorist Finance: Action Request for Senior Level Engagement on Terrorism Finance, "donors in Saudi Arabia constitute the most significant source of funding to Sunni terrorist groups worldwide." Secretary Clinton further warned that "organizations such as the International Islamic Relief Organization (IIRO), Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY)…continue to send money overseas and, at times, fund extremism overseas."

474.    Therefore, MWL has been instrumental in funneling money in support of al Qaeda and terrorist operations and in that regard has operated as a sponsor of terrorism against the United States.

65

**THE INTERNATIONAL ISLAMIC RELIEF ORGANIZATION**
**("IIRO") AS A SPONSOR OF TERRORISM**

475.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

476.    The International Islamic Relief Organization ("IIRO") is affiliated to the Muslim World League ("MWL"). IIRO was founded in 1979 just before the beginning of the Afghan War.

477.    IIRO played an important role in the funding of al Qaeda operations and attacks on America by engaging in the following:

- Enabling al Qaeda operative, Wael Jelaidan to purchase weapons for al Qaeda via the IIRO office

- Employing future 9/11 hijacker Hani Hanjour at the IIRO office

- Allowing al Qaeda military commander, Mohamed Atef to develop and plot the 9/11 attack on behalf of the IIRO

- By participating in the planning of the move of al Qaeda from Pakistan to Sudan

478.    According to Jamal al Fadl, a former al Qaeda official who became a cooperating witness for the United States, the IIRO provided false identification cards to al Qaeda members to enable them to cross the Pakistan-Afghanistan border for training at al Qaeda camps.

479.    Abu Hamam, a cousin of Osama Bin Laden ran the IIRO office in Pakistan. He was also part of the financial infrastructure of al Qaeda. Abu Hamam transferred IIRO funds to al Qaeda financial manager Madani al Tayyib, who then distributed the money to individuals who were in charge of salary, travel, and health benefits for al Qaeda members. Abu Hamam and Sayid al Tayib moved to Sudan with al Qaeda.

480.    Mohamed Jamal Khalifa established a network of charities, businesses, and Islamic institutions in the Philippines to support terrorists who planned to support terrorists who planned to attack Americans. To assist Khalifa, Ramzi Yousef, a bomber of the World Trade Center in 1993, and

66

Wali Khan Amin Shaw, also an IIRO employee in Pakistan, came to the Philippines. Yousef began training Philippine terrorists in bomb-making, while also conducting further research and refining his bomb-making technique.

481.    While working as the Director of the IIRO's Philippines branch, Khalifa maintained close connections with al Qaeda and employed members of the Abu Sayyaf Group, the al Qaeda proxy organization established by Khalifa using IIRO funds. According to a U.S. Department of the Treasury memorandum detailing the designation of the IIRO's Philippine and Indonesian Branch offices and a senior IIRO official in Saudi Arabia: "The Abu Sayyaf Group [ASG] is the most violent of the separatist groups operating in the Southern Philippines and was designated as an SDGT pursuant to Executive Order 13224 on September 24, 2001. It was formed in the early 1990's and received support and seed money from al-Qaeda."

482.    A 1996 CIA report on extremist charities noted that the IIRO was connected to Ramzi Yousef and Osama Bin Laden stating the following:

> "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Osama Bin Laden…IIRO helps fund six militant training camps in Afghanistan,"

483.    A U.S. Department cable of April 2004 stated that the IIRO is "tied to al-Qaeda and other terrorist organizations. For example, IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime. IIRO has also been cited as the conduit for funds from Osama bin Laden to terrorist organizations, specifically that the Aby Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO." Other U.S. State Department cables provide similar language regarding the IIRO and its sponsorship of al Qaeda.

484.    Khalifa's immediate replacement as head of the IIRO Philippines office was Jordanian, Zakaria Sheikh. He was deployed to East Africa where he managed IIRO's offices during the planning of the 1998 Bombings of the two U.S. Embassies in East Africa.

67

485.    According to a Philippines police investigation, long after the departure of Khalifa, the IIRO continued to support terrorism with the new head of office, a Saudi, Sheikh Humoud Lahim.

486.    INTERPOL intelligence reports include details of a transaction in which the National Commercial Bank transferred $2 million from an unknown person or entity to Salim bin Mahfouz, who was simultaneously an officer of Muwafaq and IIRO in Europe. Bin Mahfouz then transferred $500,000 to Chafiq Ayadi, the director of Muwafaq Europe and who after 9/11 was labeled a Specially Designated Global Terrorist for his activities in support of al Qaeda during his time in Europe.

487.    Bin Mahfouz transferred an additional $1.4 million to an apparent shell company in Florida, which he had formed with a senior official of Taibah International, another SDGT al Qaeda front. The same official, Zaher Abdelaziz also acted as the Balkans rep for the IIRO.

488.    According to the Indian government, IIRO officials were behind the 1999 al Qaeda plot to attack the U.S. Consulates in Madras and Calcutta, in response to the American military retaliation for the 1998 bombings of the United States Embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya. The operational cell designated to carry out the planned attacks on the U.S. Consulates was led by Sayed Aby Nesir, a Bangladeshi national who was directed to launch the attacks by Shaykh Ahmed al-Gamdin, Director of IIRO operations in Asia.

489.    During his subsequent interrogation, Abu Nesir declared that 40% to 50% of IIRO's charitable funds were being diverted to finance al Qaeda terrorist training camps in Afghanistan and Kashmir. Among other duties, Abu Nesir visited the training camps on behalf of IIRO to assess their funding needs. At the direction of al-Gamdin, Nesir himself attended one of the al Qaeda camps to receive training, where he met Osama Bin Laden.

490.    The U.S. government identified the IIRO as a Tier 1 Terrorist Non-Government Organization and a National Intelligence Priority Framework (NIPF) Counter-Terrorism (CT) Priority 2 Terrorist Support Entity (TSE). According to the United States, "Priority 2 TSEs have demonstrated

68

and sustained active financial support for terrorist organizations willing to attack U.S. persons or interests, or provide operational support to Priority 2 terrorist groups."

491.    In 1991, the IIRO established a U.S. branch in Virginia, under the name International Relief Organization, Inc. ("IRO"). The IRO and MWL were co-located at an office in Virginia near Washington, D.C. In March of 2002, federal authorities executed search warrants at the IRO/MWL office in connection with a terror investigation. A previous raid had taken place in 1997 in connection with an investigation into support for Hamas terror.

492.    The IIRO had extensive contact with the Muwafaq Foundation, founded by Khalid Bin Mahfouz and Yasin Kadi. In Croatia the two organizations were co-located next door to each other. In Albania, IIRO and Kadi's company Caravan were also co-located.

493.    The IIRO further sponsored al Qaeda through its participation in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"). The SJRC offices in Pristine, Kosovo served as a cover for al Qaeda operatives.

### THE WORLD ASSEMBY OF MUSLIM YOUTH ("WAMY") AS A SPONSOR OF TERRORISM

494.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

495.    The World Assembly of Muslim Youth ("WAMY") of Saudi Arabia was founded in 1972.

496.    WAMY used its international infrastructure to support al Qaeda both ideologically and materially. The Kingdom of Saudi Arabia provided WAMY a multi-million dollar annual budget. WAMY dedicated a significant portion of that budget to the publication and worldwide dissemination of literature designed to promote the global jihadist agenda, convince young Muslims to reject the

United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel and with the United States as their primary enemy targets.

497.    The jihadist propaganda pervades WAMY's "educational" publications. "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make jihad for the sake of Allah."

498.    At a conference in Saudi Arabia in 1991, WAMY Secretary General Dr. Maneh al Johani stated that jihad could be performed in many forms, asserting that Muslims can go to the battlefield to wage a war against the enemies of Islam or they can give their moral, physical and financial support to the cause of jihad.

499.    The WAMY journal Islamic views further exhorts Muslims to wage "Jihad against the Satan", and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels."

500.    WAMY's material support to al Qaeda began in the late 1980s in Pakistan and Afghanistan with its relationship with Lajnat al Bir al Islamiyah aka the Islamic Benevolence Committee ("LBI").

501.    While WAMY was located in Riyadh, Saudi Arabia, LBI was created in Jeddah in 1987 by Adel Batterjee as an organization to support Osama Bin Laden and the jihad in Afghanistan. According to the U.S. Department of Justice, one of its primary roles was to provide cover for foreign fighter travelling into Afghanistan.

502.    WAMY/LBI provided weapons, logistics and communications support to al Qaeda from 1989 through the September 11th attack on America.

70

503.    After Osama bin Laden left Sudan in 1996, WAMY/LBI took on the formal ownership of bin Laden's bank in Sudan, al Shamal Islamic Bank, and Batterjee became the chairman of the bank. Al Shamal, BIF and Batterjee continued to support al Qaeda financially.

504.    In March 1992, the Benevolence International Foundation ("BIF") was incorporated in Illinois. The Statutes of the organization states that its country of domicile was Liechtenstein, a country that maintained tight corporate secrecy at the time, its head office was to be in Chicago and the executive office in Jeddah, Saudi Arabia. Batterjee, his nephew, and Mazin Bahareth, the son of a key figure from the bin Laden family were the original founders. Enaam Arnaout from WAMY/LBI was tasked with running the organization. According to the U.S. Department of Justice, LBI was renamed BIF.

505.    WAMY/LBI and BIF shared an address, PO Box 1055, Peshawar, Pakistan.

506.    They also shared an address Box 10845, Riyadh, Saudi Arabia.

507.    WAMY funded a Chicago Institute which in turn funded BIF.

508.    The Islamic Cultural Center of Newark was a member of WAMY. BIF had an office in the Newark building which had originally been purchased with funds from the MWL and other Saudis. On September 10, 2001, the building was visited by 9/11 hijacker, Samir Jarrah.

509.    WAMY also had extensive ties and provided publication support to Anwar Aulaqi, a Yemeni American who directly assisted the 9/11 hijackers from inside the United States in the months and weeks before the 9/11 attacks to support their objective to attack America.

510.    WAMY maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaeda. WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden, nephew of al Qaeda leader Osama Bin Laden. Federal authorities raided WAMY's U.S. offices in 2004, in connection with an ongoing investigation of various charities' role in sponsoring al Qaeda.

511.    Abdullah bin Laden was specifically selected by the Saudi Ministry of Islamic Affairs to head WAMY's branch office in the United States. The Ministry of Islamic Affairs maintained an office at the Saudi Embassy in Washington, DC. Abdullah Bin Laden operated under a diplomatic passport while in the United States. WAMY's US office was registered as WAMY International.

512.    On September 9, 2001, two of the hijackers Nawaf al Hazmi and Khalid al Mihdhar visited Rageah's mosque in Laurel, MD. They left behind a bag. On September 11, 2001, the FBI recovered the bag to find all that was left in it was fruit, clothing, flight logs and a note stating "gift for the brothers".

513.    In Pompano Beach, Florida, Rageah's friend, the Imam Hassan Sabri also received at his mosque a bag from hijacker Mohamed Atta.

514.    In 2012, the Canadian government concluded an investigation revealing that WAMY's Canadian Branch office "maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities in terrorist activities".

515.    The investigation conducted by the Canada Revenue Agency (the "CRA") uncovered documentation and information linking the WAMY Canadian branch office, and the WAMY headquarters in Saudi Arabia, to terrorism. The WAMY branch office shared common officers, office space, contact information, and bank accounts with BIF-Canada. In addition, the CRA's investigation discovered that the WAMY branch office was funding BIF in the United States.

516.    As a result of those findings, the CRA revoked WAMY's designation as a tax exempt registered charitable organization.

517.    The United Nations refused to accredit WAMY due to its ties to terror.

518.    The preceding paragraphs demonstrate that WAMY and its founders, directors, officers and employees knowingly and purposely supported al Qaeda with money, weapons, logistical support, travel and more to support their goal to attack America.

## AL HARAMAIN ISLAMIC FOUNDATION AS A SPONSOR OF TERRORISM

519.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

520.    Defendant Al Haramain Islamic Foundation ("AHIF") is a charity with its headquarters in Saudi Arabia with numerous offices worldwide.

521.    The United States Departement of Treasury declared AHIF as Specially Designated Global Terrorists pursuant to Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten To Commit or Support Terrorism.

522.    On June 7, 2004, the founder and former leader of AHIF, Aqeel Abdulazi Aqeel alqeel, was listed on a INTERPOL- United Nations Security Counsel Special Notice for being associated with Al-Qaeda, Osama bin Laden or the Taliban for "participating in the financing, planning, facilitating, preparing, or perpetrating of acts of activities by, in conjunction with, under the name of, on behalf or in support of Al-Qaeda".

523.    Between 2004 and 2010, fourteen branches of AHIF were listed on the United Nations Security Counsel Al-Qaeda Sanctions Committee list of "individuals, groups, undertakings and other entities associated with Al-Qaeda" and subject to "sanctions, measures (assets freeze, travel ban and arms embargo) imposed by the Security Council.

524.    The U.S. branch of AHIF was established in 1997 with headquarters in Ashland, Oregon and an office in Springfield, Missouri.

525.    The U.S. branch of AHIF received approximately $700,000.00 from its parent offices in Saudi Arabia.

526.    AHIF of Ashland, Oregon sent at leat $150,000.00 through Saudi Arabia to fund terrorist activities.

527.    On January 22, 2004, the United states designated the AHIF branches in Indonesia, Kenya, Tanzania and Pakistan as terrorists for providing "financial, material and logistical support to Osama bin Laden's al Qaeda network and other terrorist organizations."

528.    On February 19, 2004 the assets of the AHIF U.S. branch were blocked by the U.S. Treasury Departement pending investigation. The results of such investigation showed "direct links between the U.S. branch and Osama bin Laden"

529.    On June 19, 2008, the U.S. Department of Treasury designated the AHIF for having provided financial and material support to al Qaeda, as well as a wide range of designated terrorists and terrorist organizaions.

530.    In 2008 any assets held by the AHIF in the United States were frozen and United States persons were prohibited from engaging in any transcations with AHIF. The AHIF provide financial and other material support, including weapons and logistics to support al Qaeda's September 11, 2001 attacks on the United States.

## AL RAJHI BANK AS A SPONSOR OF TERRORISM

531.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

532.    In 1959 members of the al Rajhi family established the Al Rajhi Company for Currency Exchange and Commerce in Riyadh, Saudi Arabia.

533.    In 1988 the currency exchange company formally became a shareholding company called al Rajhi Banking and Investment Corporation ("al Rajhi Bank").  The new bank was the first in the Kingdom of Saudi Arabia licensed to operate on Islamic principles. The majority of shares were retained by the family but minority shares were allowed to be purchased by sons of senior government ministers and religious authorities.

534. Founding brother Suleiman Abdel Aziz al Rajhi was the Chairman, Managing Director and largest shareholder of al Rajhi Bank.

535. Osama Bin Laden himself held accounts at al Rajhi Bank. By 1993, due to press accounts of Osama's terrorist attempt to kill Americans in Yemen, it was public knowledge that he had the intent to develop the ability to attack Americans.

536. The U.S. Ambassador discussed this with Saudi officials and was told that Bin Laden's accounts were frozen in 1994. By 1993/4, al Rajhi Bank knew that Osama Bin Laden was such a dangerous terrorist that it warranted freezing his assets. Instead al Rajhi Bank continued to assist Bin Laden and other al Qaeda members transfer money to support their plan to attack America.

537. Yasin Kadi held eight accounts at al Rajhi bank.

538. A Saudi founding member of al Qaeda and one of its early financial managers, Abu Hammam, held his account at al Rajhi Bank.

539. At least three hijackers had accounts or made use of financial services at al Rajhi Bank.

540. Money was funneled to the Hamburg, Germany al Qaeda cell through the al Rajhi Bank to businessmen Mahmoud Darkanzanli and Abdul Fattah Zammar, who in turn provided the al Qaeda cell of the September 11th hijackers with financial and logistical support.

541. September 11th hijacker Abdulaziz al Omari received funds into his al Rajhi Bank Account. Al Omari frequently utilized a credit card drawn on Al Rajhi Bank in the planning of the attacks. On September 7, 2001, four days prior to the 9/11 attacks, al Omari received a wire transfer from al Rajhi Bank, Buraidah Branch in Jeddah, Saudi Arabia.

542. U.S. Investigations found that al Qaeda and other terrorist organizations had confidence in al Rajhi Bank's commitment to their terrorist cause, as reflected by the United States' finding that extremists "ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use al Rajhi Bank.

543.    U.S. Investigations also documented very hands-on dealings between Al Rajhi Bank and terrorists at operational levels. In this regard, a 2003 CIA report says that Al Rajhi Bank couriers "delivered money to the Indonesian surgent group Kompak to find weapons purchases and bomb-making activities." Kompak is an al Qaeda official, which also received funding through al Haramain Islamic Foundation.

544.    A November 16, 2001 U.S Intelligence memo states that a money order for Osama Bin Laden's second-in-command, Ayman al Zawahiri, traveled on a visa that Al Rajhi Bank had obtained for him.

545.    Zacarias Moussaoui, the so-called 20th hijacker and an al-Qaeda member with personal experience in managing al Qaeda's database of donors testified that Osama Bin Laden described al Rajhi Bank as "like a good brother". Moussaoui explained that al Rajhi Bank was responsible for "moving money around" for al Qaeda, and was one of the main supporters of the Saudi charity fronts by al Qaeda, including the Al Haramain Islamic Foundation.

546.    Following 9/11, several U.S. State Department cables focused on the al Qaeda related activities of al Rajhi Bank. In a September 2004 cable titled Terrorist Financing: Al Rajhi Bank, U.S. Treasury counter-terrorism official told the Saudis that he had real "concerns about the financial activities facilitated by Al Rajhi".

547.    Al Rajhi Bank provided financial services as well as made donations to al Qaeda's charities, including the Muslim World League, International Islamic Relief Organization, World Assembly of Muslim Youth, and Al Haramain Islamic Foundation.

548.    According to a U.S. State Department diplomatic cable, "Osama bin Laden used the entire IIRO network for his terrorist activities".

549.    Al Rajhi Bank also collected charitable donations on behalf of Sanabel al Kheer ("Seeds of Charity"), the financial/investment arm of the IIRO, depositing the donations into Sanabel's

al Rajhi Bank account. Sanabel al Kheer, which the IIRO owns and controls, was established to make investments to support the IIRO's charitable operations. Like the IIRO, Sanabel al Kheer was repeatedly implicated in terrorist activities in the years prior to 9/11 as well. Of particular note, an FBI investigation implicated the U.S. arm of Sanabel al Kheer in the financing of the African embassy bombing attacks.

550. In 2000, a top official from al-Haramain deposited $130,000 in $1,000 traveler's checks into an al Rajhi account in Riyadh. According to a U.S. indictment, the funds were then sent to al-Qaeda fighters in Chechnya.

551. In connection with the resulting federal prosecution of an al Haramain official, the U.S. government issued an administrative subpoena to al Rajhi Bank, requesting that al Rajhi Bank produce documents relevant and essential to the prosecution. Al Rajhi Bank refused to comply. Al Rajhi Bank was generous in its support of other of al Qaeda's charity arms as well, providing not only financial services but significant funding as well.

552. Al Rajhi Bank's own contributions to al Qaeda charities included: a 1994 $533,333 donation to the Saudi High Commission ("SHC"); a 1995 $400,000 donation to the SHC; and an $80,000 donation to the SHC in 1996; while collecting donations for Bosnia.

553. A U.N. sponsored audit of the TWRA's financial and administrative records uncovered the Prince Salman donations as well as two (2) transfers of money totaling $53, 287.70 sent by "Sulaiman Al Rajhi" to the TWRA account in June and July of 1993, and three (3) transfers totaling $155,894.28 to the TWRA by "Saleh Alabdulaziz Al Rajhi and Brothers" in 1993 and 1994. The 9/11 Commission found that Osama Bin Laden used the TWRA to covertly provide support for terrorist activities.

554. In 2013, the United States Senate Permanent Subcommittee on Investigations issued a report entitled U.S. Vulnerabilities to Money laundering, Drugs, and Terrorist Financing in which it surveyed much of the foregoing evidence concerning al Rajhi Bank's terrorist connections.

555. This report succinctly describing the import of the various, independent sources of evidence and connections to terrorism. The report states: "Taken together, the information – the Al Qaeda Golden Chain document, the 2002 search of Al Rajhi-related entities in Virginia, the 2003 CIA report, the 2005 al Haramain Foundation indictment and trial, the 2007 media reports, the 2010 refusal to provide bank documents in a terrorist-financing trial, and the multiple link to suspect banks and accountholders – present an unusual array of troubling allegations about a particular financial institution."

556. As reflected by the above and confirmed by U.S. investigations, a broad spectrum of evidence demonstrate that al Rajhi Bank was not merely a provider of services to al Qaeda, but an active architect and manager of al Qaeda's global financial and logistical support network, who along with others, actively deployed resources to advance al Qaeda's continuous efforts to attack the United States. The support and services of al Rajhi Bank provided to al Qaeda were essential to the development and maintenance of the infrastructure employed by al Qaeda to carry out the September 11th Attacks, and designed to assist al Qaeda in attacking the United States.

## DUBAI BANK AS A SPONSOR OF TERRORISM

557. Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

558. Dubai Islamic Bank ("DIB") is based in the United Arab Emirates.

559.    DIB knowingly and purposefully provided financial services and other forms of material support to al Qaeda to support their plans to attack America, including the transfer of financial resources to al Qaeda operatives who participated in the planning and execution of the September 11th attacks as well as other al Qaeda terrorist attacks.

560.    Investigations into the financing of the September 11th Attack have confirmed that Mustafa Ahmed al Hasawi at the direction of senior al Qaeda leaders transferred funds from an account at the DIB to the September 11th hijackers Marwan al Shehhi and Mohamed Atta.

561.    DIB has long known that the accounts it maintained were being used to launder and distribute funds for al Qaeda operations and terrorist attacks, including attacks against Americans.

562.    Despite its express knowledge that accounts it maintained were being used to launder and distribute funds for al Qaeda operations and terrorist attacks, DIB continued to maintain al Qaeda accounts and support its goals. In doing so, the bank knowingly provided financial services and other forms of material support to al Qaeda.

563.    DIB has further sponsored al Qaeda through its ownership interest in al Shamal Bank and al Tadamon Bank in Sudan.

564.    Al Qaeda used the UAE's banking and financial system, and DIB in particular, as an entry point into the global financial system, for purposes of funding the September 11th attacks:

565.    "It is now apparent that institutions in the United Arab Emirates, the region's most developed and lightly regulated financial center, played a key role in moving resources to those who planned and carried out the September 11 attacks." See NATO Parliamentary Assembly, The Economic Consequences of September 11, 2001 and the Economic Dimension of Anti-Terrorism.

566.    From its very establishment in 1975, DIB has been controlled by individuals who openly facilitate and advance a radical Islamic agenda. DIB's Fatwa and Sharia Supervisory Board in

particular, has been populated by Islamic clerics notorious for promoting radical Islamic agendas, sanctioning jihad, and offering justification for martyrdom operations.

567. For instance DIB Sharia Board member, Dr. Ajeel Jassem al Nashmi, issued a fatwa endorsing the legality of suicide attacks. In another fatwa, Nashmi argues in support of jihad and states that it is permissible to pay zakat funds (a tax that is distributed as alms for the poor) to those Islamic groups that wish to "restore Islamic life, erase Kufr regimes, and replace them with the Sharia'a of Allah."

568. DIB Sharia board member Dr. Ali Muhssein al Din Qaradaghi who has also issued several fatwas justifying jihad, stating that "Jihad today is a personal duty imposed on anyone who can carry it out, with his soul, money and body ... with all the means of jihad."

569. Sheikh Yusuf al Qaradawi, an Egyptian Islamic scholar based in Qatar is well known for his radical religious teachings and commentary in support of acts of terrorism, was one of the first DIB Sharia advisors.  Qaradawi issued a fatwa in 2003 asserting that Muslims killed fighting United States forces are martyrs: "Those killed fighting the American forces are martyrs given their good intentions since they consider these invading troops an enemy within their territories but without their will."

570. DIB's collaboration with bin Laden in the cause of violent jihad dates to the Afghan jihad. During that time, DIB maintained and serviced a jihad account for Abdallah Azzam, spiritual mentor to Osama Bin Laden and co-leader (with bin Laden) of the mujahideen during the "holy war" against the Soviet occupation of Afghanistan of the 1980s. The account was prominently displayed in public fund raising efforts of Azzam.

571.  In his book, "Ayyat al Rahman fee Jihad al-Afghan," ("God's Signs in the Afghan Jihad"), Azzam directs monetary donations for the Afghan mujahideen be sent to Account No. 1335 at Dubai Islamic Bank.

572.    Azzam also issued a fatwa, "Defense of the Muslim Lands," considered to be one of the most important Islamic publications declaring jihad as a personal obligation for all Muslims. In the introduction, Azzam states that he submitted the fatwa to several prominent Islamic scholars for their approval, prior to publication.  Dr. Hussain Hamid Hassan, a long-time member of DIB's Fatwa and Sharia Supervisory Board and its current Chairman, reviewed Azzam's book and provided his personal endorsement.

573.    DIB's support continued when bin Laden moved al Qaeda from Afghanistan to Sudan. Sayid al Tayyib was al Qaeda's chief financial officer during the early 1990s while al Qaeda was in Sudan. Tayyib held at least two accounts at DIB.  Jamal al Fadl, a former al Qaeda official who became a cooperating witness for the United States, said Tayyib was "in charge of most of Osama bin Ladin's money, including the money located outside of Sudan." Tayyib was responsible for controlling much of the money sent to Osama Bin Laden "from wealthy individuals in the Gulf area."

574.    "Al-Tayyib controlled and monitored Osama bin Ladin's money and kept portions of the money in banks under (Al-Tayyib) his own name and in other names such as Abu Amjed, Abu Mahdi, and Abu Khallifah al Omani."

575.    DIB was a shareholder of Sudan based al Shamal Bank.  Other shareholders included Osama Bin Laden, Prince Mohamed and Yasin Kadi.

576.    DIB was directly implicated in the 1998 U.S. Embassy bombings in Kenya and Tanzania.  According to the NATO report "Al Qaeda had previously used the Dubai Islamic Bank and local Hawala transfer companies to fund the bombings of the American embassies in Kenya and Tanzania."

577.    In the wake of the attacks, U.S. officials pressed the UAE to enact more rigorous banking controls and to close certain accounts at DIB that were used to move money intended for the

attacks.  In connection with those discussions, "the U.S. asked in 1998 that some Taliban accounts be closed at Dubai Islamic Bank."

578.    Mamdouh Mahmud Salim, a founding member of al Qaeda responsible for managing terrorist training camps in Afghanistan and Pakistan and undertaking efforts to obtain nuclear weapons for al Qaeda, was arrested by German authorities on September 16, 1998 for his role in the 1998 Embassy bombings.

579.    A transcript of Salim's interrogation by FBI and German officials contains the items in Salim's possession at the time of his arrest, including three DIB banking cards under his name.  Salim was heavily involved in the international business and money laundering activities of al Qaeda.

580.    Even after Osama Bin Laden moved from Sudan back to Afghanistan, al Qaeda maintained business activities in Sudan.  However the business arrangements and the financial transactions to support them became more covert.  DIB was part of the marketing of Sudanese agricultural commodities undertaken by Yasin Kadi in 1999-2000.

581.    In the wake of the 1998 embassy bombings, U.S. officials were concerned that members of the Taliban were using DIB to fund al Qaeda's terrorist activities, including the attacks on the embassies themselves.

582.    By 1999, al Qaeda's use of DIB to launder and move money was so pervasive that officials from the Departments of State and Treasury, and the National Security Council, traveled to Dubai to demand that the UAE government take steps to end DIB's relationship with Osama Bin Laden.

583.    According to a July 8, 1999 State Department press conference, DIB's involvement with "terrorist money laundering" was the key concern. The same day as the briefing, it was reported in the New York Times that the "Central Intelligence Agency has obtained evidence that Mr. bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai.  According to the

Times, "United States intelligence officials said they had evidence that Mr. bin Laden had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank."  Among other things, U.S. officials were concerned with a single wire transfer of $50 million to bin Laden through DIB, originating from wealthy Saudis in the Kingdom.

584.    Despite U.S. government warnings, DIB continued to maintain relationships with, and provide critical financial support to, members of al Qaeda. Consequently, the UAE and DIB became an important logistical and financial base of operations for al Qaeda in advance of the September 11th attacks. In fact, Khalid Sheikh Mohammed ("KSM"), the mastermind of the attacks, chose DIB as a point of access into the global financial system for funding the 9/11 plot.

585.    KSM ordered the hijackers to travel "through the UAE en route to the United States," where they were primarily assisted by al Qaeda operatives Ali Abdul Aziz Ali and Mustafa al Hawsawi."

586.    Upon their arrival in the U.S., the hijackers were wired significant sums of money from Ali and Hawsawi via their accounts at DIB. September 11th hijacker Faiz Rashid Ahmad Hassan al Qadi (a/k/a Fayez Banihammad) held an account at DIB, as did al Qaeda member Ali Salah Muhammad Kahlah al Marri. Al Marri attended al Qaeda terrorist training camps and was instructed by KSM "to enter the United States no later than September 10, 2001."

587.    Shortly after the September 11th  attacks, the Central Bank of the UAE ordered the freezing of accounts and investments of approximately 26 individuals and organizations suspected of ties to the al Qaeda network, including accounts at DIB.  The actions of the Central Bank mirrored the regulatory alert issued days earlier by Luxembourg's financial supervisory commission identifying DIB's connection to Osama Bin Laden.

588.    DIB has also provided financial services to Executive Order 13224 designees, including the al Qaeda charity front International Islamic Relief Organization ("IIRO").  IIRO had at least one account at DIB.

589.    DIB also held an account  for Khalid  Ballayth  labeled  by Swiss authorities  as being "a close associate of Osama Bin Laden", who did business with the IIRO and the Muwafaq Foundation.

590.    Al Qaeda  financier  Ahmed Nur Ali Jumale, an SDGT, designated by the Treasury Department on November  7, 2001 for his support to al Qaeda, including a number of his designated businesses that make up the al Barakaat financial and telecommunications conglomerate, also held accounts at DIB. According to the Treasury officials, Jumale used the al Barakaat group of companies "to transmit funds, intelligence and instructions" to al Qaeda and other terrorist organizations.  Several of those DIB accounts  were seized pursuant to the instructions of the Central Bank, including Jumale's personal  and VISA accounts and accounts  for al Barakah Exchange and al Barakaat  Bank of Somalia.

591.    Ali Abdul Aziz Ali, a member of al Qaeda and Khalid Sheikh Mohamed's nephew, was instrumental in providing financial and logistical assistance to the 9/11 hijackers.  As the 9/11 Commission found, "the hijackers received assistance in financing their activities from two facilitators based in the United Arab Emirates: Ali Abdul Aziz Ali …and Mustafa al Hawsawi."

592.    At the direction of KSM, Ali was responsible for transferring significant sums of money from his post in the UAE to the hijackers in the United States, including a $20,000 wire from Dubai to a Florida SunTrust bank account held by hijackers Mohammed Atta and Marwan al Shehhi on August 29, 2000.  On September 17, 2000, Ali transferred $70,000 to the same Florida SunTrust account. According to the U.S. government, Ali opened a bank account at the Dubai Islamic Bank during the same period that he was carrying out KSM's orders.

593.    Mustafa Ahmed al Hawsawi also held an account at the Dubai Islamic Bank which he used to facilitate the movement of significant sums of money to the hijackers for travel, flight training, and other expenses.

594.    In 1999, a Kadi company using money borrowed from Faisal Finance Switzerland transferred funds via Dan Fodio's account at Dubai Islamic bank to another Kadi company with an account at al Shamal Bank.  The funds were then transferred on to The Fanners Bank, another Sudanese bank founded by Osama Bin Laden and the NIF.

595.    Fanner 's Bank was a US Treasury Specially Designated National entity at the time of the transfers. Kadi's company also held accounts at al Shamal Bank in which millions of dollars transited.

596.    DIB knowingly and purposefully supported al Qaeda and its plans to attack Americans by facilitating the transfer of money to al Qaeda members, including the 9/11 hijackers.

## DALLAH AVCO AS A SPONSOR OF TERRORISM

597.    Plaintiffs repeat and reallege the General Allegations above and incorporate by reference each and every allegation as if fully set forth herein.

598.    At all relevant times herein, Dallah Al Baraka Group LLC (hereinafter "DABG") was and is a privately owned multinational corporation based in Jeddah, Saudi Arabia.

599.    DABG was and is a multinational conglomerate with investment holdings in major industries, including but not limited to, financial and banking services, healthcare, manufacturing, real estate, and/or transportation operations and maintenance services.

600.    DABG's former chief executive and current chairman was and is Saudi resident and billionaire Saleh Abdullah Kamel.

85

601.   Dallah Avco Trans Arabia ("Dallah Avco") was and is a wholly owned subsidiary of DABG, specializing in aviation services.

602.   Dallah Avco has extensive contracts with the Saudi Ministry of Defense and Aviation.

603.   In the years prior to September 11, 2001, Dallah Avco provided financial, logistical, and /or ideological support, either directly and/or indirectly through its agents, servants, representatives, and/or employees, to those individuals responsible for plotting and, ultimately, carrying out the terror attacks on American citizens on U.S. soil, and specifically the attacks of September 11 , 2001.

## Dallah Avco and Omar al Bayoumi

604.   From 1994 through 2001, Dallah Avco knowingly and willfully paid Saudi national Omar al Bayoumi (a/k/a "Omar Ahmad Mustafa Al-Baioomi") a salary and provided him with unlimited funds in furtherance of his work integrating the 9/11 hijackers into the Islamic radical community within the United States and helping them secure the means and support to plan, plot, and ultimately, carry out acts of terror on American citizens on U.S. soil, and specifically those attacks which occurred on September 11, 2001.

605.   Omar al Bayoumi was a member of a broad support network orchestrated by the Kingdom of Saudi Arabia and the Saudi Ministry of Islamic Affairs to provide critical financial, logistical and ideological support to those individuals responsible for plotting, and ultimately carrying out, the terrorist attacks of September 11, 2001.

606.   Due to his long-standing, yet murky, relationship with the Saudi government, both American intelligence officers and members of his own Arab community, believed Omar al Bayoumi served as a covert Saudi intelligence agent in the years leading up to the September 11th attacks.

607.    From mid-1980s until at least 2001, Omar al Bayoumi purportedly worked as an employee of the Saudi Arabian government in the Saudi Arabian Presidency of Civil Aviation ("PCA"), a branch of the Saudi Ministry of Defense.

608.    In August 1994, while still a paid employee of PCA, Bayoumi moved to San Diego California at the direction of the Saudi government.

609.    In 1994, Bayoumi was granted a position by the PCA to work with Dallah Avco in Saudi Arabia.

610.    Bayoumi remained in the United States for the next seven years, from 1994 to 2001.

611.    In or around 1995, Bayoumi began receiving a $3,000 monthly salary from Dallah Avco. Dallah Avco reported that the $3,000 salary was for Bayoumi 's work on an aviation project commissioned by the Saudi government and taking place in Saudi Arabia.

612.    Bayoumi enrolled in English as a Second Language Class at San Diego State University, and held himself out to the public as a "low-income student."

613.    Bayoumi 's derived his primary source of income from his employment with Dallah Avco.   Dallah Avco and the government of Saudi Arabia financed all of Bayoumi 's personal and educational expenses for the seven years he resided in San Diego, California.

614.    Bayoumi showed up for work only once during the seven years he was receiving a salary from Dallah Avco.

615.    Bayoumi 's chronic absence led employees at the company to describe him as a "ghost employee," one of many Saudis on the payroll who were not required to work.

616.    According to U.S. intelligence, there were approximately fifty (50) individuals who, like Bayoumi, were being carried on the books at Dallah Avco and were being paid for doing nothing.

617.    Using the funds he received from Dallah Avco, Bayoumi rented an apartment in a San Diego suburb.

87

618. On his rental application, Bayoumi falsely reported his job as "student". He stated on that application that his income was $2,800 a month.

619. Despite Bayoumi's representations that he was a student with a modest income, the Report of the Congressional Joint Inquiry into the Terrorist Attacks of September 11 , 2001 ("9/11 Joint Inquiry Report"), concluded that Bayoumi "had access to seemingly unlimited funding from Saudi Arabia."

620. According to the Joint Inquiry Report, "one of the FBI's best sources in San Diego informed the FBI that he thought that al-Bayoumi must be an intelligence officer for Saudi Arabia or another foreign power."

621. A number of witnesses in San Diego also believed that Bayoumi was closely connected to the Saudi government and likely working as an intelligence agent.

622. Several people interviewed by the FBI considered al Bayoumi to have a relationship with Saudi Intelligence known as the Saudi General Intelligence Directorate ("GID").

623. While living in San Diego, Bayoumi ingratiated himself within the San Diego Muslim community, spending much of his time interacting with the regional mosques, including the Islamic Center of San Diego.

624. Bayoumi became well-established and widely accepted in the local San Diego Muslim community.

625. In 1998, a FBI source identified Bayoumi as the individual who delivered approximately $400,000 from Saudi philanthropist Saed al Habib (a/k/a Mohamed Barak) for the construction of a Kurdish mosque in in El Cajon, CA approximately 15 miles northeast of San Diego.

626. The substantial donation was made on the condition that the mosque hire Bayoumi as the building manager and provide him with a private office.

627.    Following completion of the mosque, however, the mosque's leadership became unhappy with Bayoumi due to his failure to show up for work and the discovery of financial irregularities relating to his collection and distribution of funds.  They neither liked or trusted him and eventually asked Bayoumi to leave the premises.

628.    Between December 1998 and December 2000, Bayoumi communicated via telephone with Fahad al Thumairy, an official from the Consulate of Saudi Arabia's Ministry of Islamic Affairs office in Los Angeles, California. Bayoumi regarded Thumairy as a religious and spiritual advisor. Phone records between Bayoumi and Thumairy reveal that the two men exchanged phone calls on at least twenty-one occasions, between December 1998 and December 20, 2000.

629.    A month prior to the 9/11 attack, hijackers Nawaf al-Hazmi and Khalid al- Mindhar, began appearing at Thumairy's mosque in Los Angeles.

630.    Witnesses told 9/11 Commission Investigators that they had seen Thumairy meeting with Bayoumi on several occasions at the King Fahd Mosque.

631.    Thumairy, like Bayoumi, had extensive ties to the Islamic community in Southern California.

632.    Thumairy graduated with a degree in Islamic studies from the Imam Muhammad Bin Saudi Islamic University in Saudi Arabia.  After graduation, Thumairy immediately joined the Saudi Ministry of lslamic Affairs.  The Ministry sent Thumairy to the Saudi Embassy in Washington, D.C. before assigning him to the Saudi Consulate in Los Angeles.

633.    From 1996 to 2003, Thumairy served as an accredited diplomat at the Saudi Consulate and was a religious leader at the King Fahd Mosque in Culver City, CA, a mosque that had been built with funds from the government of Saudi Arabia.

634.     Thumairy was an Islamic fundamentalist who believed in strict adherence to the orthodox Wahhabi doctrine.  Thumairy was associated with a particularly radical faction within the community of local worshippers, and had a network of contacts in other cities in the United States."

635.     While a religious leader at the King Fahd Mosque, Thumairy openly espoused radical fundamentalist ideals through his religious teachings.

636.     Due to his suspected ties to terrorism and attacks on America, the United States eventually revoked Thumairy's diplomatic visa, deported him, and banned him from re-entering the United States in May 2003.

637.     In January 2000, Thumairy was appointed by his superiors at the Ministry of Islamic Affairs to serve as the Saudi Consulate's liaison to the King Fahd Mosque, per the request of his superiors at the Ministry of Islamic Affairs.

638.     On January 15, 2000, future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar arrived in the United States via a United Airlines flight from Bangkok, Thailand after attending an al Qaeda summit in Kuala Lumpur, Malaysia.  Attendees at the summit included al Qaeda members, Ramzi Binalshibh, Tawfiq bin Attash, and Abu Bara al Yemeni as well as the leader of the al Qaeda affiliate in Asia, Hambali, who hosted the meeting.  Key details of the 9/11 attacks were discussed at this summit.

639.     Despite there being over 50 mosques in the Los Angeles area, between January I5, 2000 through February 1, 2000, future hijackers, Hazmi and Mihdhar, spent time at the King Fahd Mosque where Thumairy was an active leader.

640.     On February 1, 2000, Bayoumi, along with a cohort from the San Diego Islamic Center who he had recently met, drove nearly two hours from San Diego to the Saudi Arabian Royal Consulate in Los Angeles to meet with Thumairy.  Bayoumi had previously disclosed to friends at the Islamic Center that he had friends at the Saudi Consulate.  Although the stated purpose of the trip was

to resolve a visa issue and obtain Islamic religious materials and Korans, Bayoumi had told at least one other person prior to the trip that he was going to Los Angeles to pick up visitors.

641.    Bayoumi met with Thumairy for over an hour. U.S. officials believe that Thumairy and Bayoumi discussed the recent arrival of future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar in the United States, and Bayoumi was tasked with getting them welcomed and assimilated into the San Diego Muslim community.

642.    When Thumairy was later questioned on February 23, 2004 by 9/11 Commission members, Dietrich Snell and Raj De, about his relationship with Bayoumi he stated: "He did not recognize the name Omar al-Bayoumi . When shown a photo of al- Bayoumi, al-Thumairy first denied recognizing him.  At this time, Major Khalid [a Saudi official with the Mahabith (the police agency of the Ministry of Interior)] whispered something to him in Arabic, and Thumairy said in English, "Oh Bayoumi." Al-Thumairy then acknowledged that recognized al-Bayoumi because he had seen him on television, but denied ever seeing him in Los Angeles."

643.    On February 1, 2000, following the meeting with Thumairy, Bayoumi and his cohort drove to the King Fahd Mosque.  The two men then traveled to a nearby Middle Eastern restaurant known as the Mediterranean Cafe, where they met with 9/11 hijackers, Hazmi and Mihdhar, over lunch.

644.    During the February 1, 2000 meeting with the future hijackers, Bayoumi offered to help Hazmi and Mihdhar relocate to San Diego.  Hazmi and Mihdhar accepted Bayoumi 's offer.

645.    On February 4, 2000, Hazmi and Mihdhar arrived in San Diego and Bayoumi began undertaking extraordinary efforts to get the future hijackers assimilated into the local Muslim community, so that they could eventually carry out Osama Bin Laden's plan to attack America.

646.    As the 9/11 Commission observed, the two hijackers were "ill prepared for a mission in the United States.  Their only qualifications for this plot were their devotion to Osama Bin Ladin, their

91

veteran service, and their ability to get valid U.S. visas.  Neither had spent any time in the West, and neither spoke much, if any, English."  It was therefore "unlikely that Hazmi and Mihdhar- neither of whom, in contrast to the Hamburg group, had any prior exposure to life in the West- would have come to the United States without arranging [for them] to receive assistance from one or more individuals informed in advance of their arrival."

647.    The hijackers required a support network in the United States to help them "hide in plain sight" in order to finance, plan, and ultimately carry out the attacks on Americans in the United States.

648.    Dallah Avco and the Saudi government employed Bayoumi and paid him a monthly salary to serve as the point person to facilitate the future hijackers' transition and preparations in the United States, and to also act as a conduit through which Dallah Avco could transfer funds into the San Diego terrorist cell housing the future 9/11 attackers.

649.    Telephone records from January 2000 through March 2000, and specifically the timeframe when 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles and subsequently settled in San Diego with Bayoumi's assistance, reveal extensive contacts between Bayoumi's phone and Saudi officials in Washington D.C. and Los Angeles, CA.

650.    Bayoumi's phone made approximately 141 calls to Saudi officials in Washington, D.C. at the Saudi Arabian Royal Embassy, the Saudi Islamic Affairs Department, the Saudi Arabian Cultural Mission, the Saudi Arabian Education Mission, and the Saudi National Guard. Bayoumi's phone also made approximately 34 calls to the Saudi Arabian Royal Consulate in Los Angeles.

651.    FBI records indicate the two future hijackers used Bayoumi's phone during the months of February and March 2000.

652.    Records further indicate that the Saudi government directed Dallah Avco to keep Bayoumi in the United States, and on its payroll, in order for them to employ and pay him. In or

around April 1999, Dallah Avco sought to terminate Bayoumi's annual employment contract. To that end, a Dallah Avco wrote to the PCA advising that "the company is not willing to renew the period for another year and we wish this to be known." A PCA official immediately responded with an "extremely urgent" letter informing Dallah Avco that the Saudi government wanted Bayoumi's contract renewed "as quickly as possible" because Bayoumi "was a respresentative that PCA personnel wished to keep in America."

653.    The two hijackers initially moved in with Bayoumi and his family at their residence at the Parkwood Apartment compex in San Diego, until Bayoumi was able to secure similar housing for them at the same apartment building.

654.    Bayoumi recommended Hazmi and Mihdhar to the property manager of the Parkwood Apartments and acted as a co-signer and guarantor for them on their rental application because they did not have established credit.   On the application Bayoumi is listed as a "friend" by Hazmi and Mihdhar.

655.    Bayoumi helped Hazmi and Mihdhar open a bank account and deposited $9,000 into it.

656.    Bayoumi paid the hijackers' security deposit and first month 's rent.

657.    After Hazmi and Mihdhar moved into their own apartment at the Parkwood Apartments, Bayoumi organized a party to welcome the two men to San Diego.  The party was attended by approximately 20 men from the local Muslim community, including members of the ICSD.  Cayson bin Don attended the party and used Bayoumi 's video camera to videotape the party.

658.    In or around March 2000, after Bayoumi invited Hazmi and Mihdhar to relocate to San Diego, found them an apartment, opened a bank account for them, and introduced them to the local Muslim community, Dallah Avco gave Bayoumi a promotion, raised his salary, and further increased his "other allowances" stipend from approximately $465 to $3,925 a month.

659. In his new, upgraded, better paid position, and at the direction of his employer Dallah Avco and the Saudi government, Bayoumi followed his instructions and used his established connections within the Islamic radical community to introduce Hazmi and Mihdar and future 9/11 hijacker Hani Hanjour, who was also seen in Bayoumi 's apartment on at least two occasions, to key members of the San Diego Muslim community that not only shared their extremist beliefs and hatred for the United States, but would also provide significant logistical and ideological support to the hijackers as they plotted the attacks.

660. Bayoumi used his good will within the community to help the future 9/11 attackers form trusted relationships with radical leaders in the San Diego community.

661. On June 23, 2001, just a few months before the September 11, 2001 terror attacks, Bayoumi and his family moved out of their apartment in San Diego. Bayoumi advised he was leaving the United States, but left no forwarding address with the property management company.

662. Dallah Avco hired, paid, and instructed Bayoumi for the specific purpose of his gathering intelligence from the radical Islamic community in San Diego, ingratiate himself within the community, and using his connections with other al Qaeda sympathizers to form a financial and practical support network which enabled the 9/11 hijackers to successfully carry out the terror attack on American citizens on American soil.

663. Absent the critical financial and logistical support for an attack on America which Dallah Avco knowingly and willingly provided to Bayoumi, under the guise of employment, the 9/11 hijackers would have been incapable of plotting, preparing for, and conducting the September 11, 2001 terrorist attacks.

664. According to the 9/11 Commission Report, in a post-9/11 interview with law enforcement, Mohdhar Abdullah, a friend of Bayoumi's, claimed that Bayoumi specifically asked him to "be the individual to acclimate the hijackers to the United States, particularly San Diego, CA."

665. Per Bayoumi's instructions Abdullah helped hijackers Hazmi and Mihdhar locate and apply to language and flight schools, and assisted them in translating between English and Arabic.

666. Per Bayoumi's instructions, Abdullah also helped Hazmi and Mihdhar obtain fake driver's licenses with false names from an unknown individual in Los Angeles. Abdullah drove the hijackers from San Diego to an area in Los Angeles, near McArthur Park and a second location near Huntington Park where the unknown individual was selling the fake cards.

667. Abdullah purchased approximately four or five fraudulent California Motor Vehicle identification cards and gave them to Hazmi and Mihdhar.

668. On June 10, 2001, Los Angeles International Security tapes show Abdullah and Hazmi using a video camera to scout out the airport.

669. During a number of interviews with the FBI following the 9/11 attacks, Abdullah reportedly admitted knowing of Mihdhar's and Hazmi's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden, an Islamic extremist group in Yemen with ties to al Qaeda. According to the 9/11 Commission Report, Abdullah was clearly sympathetic to those extremist views and expressed hatred for the U.S. government.

670. Bayoumi as a result of his financing and support from Dallah Avco, successfully helped the 9/11 hijackers assimilate into the San Diego terror network and find funding and support to plan and carry out the September 11th attacks.

## COUNT ONE

**AIDING, ABETING AND CONSPIRING WITH ALQAEDA TO
CONDUCT THE ATTACKS ON THE UNITED STATES ON
SEPTEMBER 11, 2001 IN VIOLATION OF THE JUSTICE
AGAINST SPONSORS OF TERRORISM ACT OF 2016**

662.    Plaintiffs repeat, reiterate and reallege each and every paragraph conatained in this Complaint as if set forth more fully at length herein, and further allege the following.

663.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO knowingly and recklessly contributed material support or resources, directly or indirectly, to  Al-Qaeda in order to commit acts of terrorism against  the United States on September 11, 2001.

664.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO, acting  through affiliated groups or individuals, raised significant funds to Al-Qaeda outside the United States for conduct directed and targeted at the United States on September 11, 2001 causing personal injuries to the Plaintiffs.

665.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD

ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO, aided and abetted, by knowingly providing substantial assistance or conspired with Al-Qaeda to commit the terrorist acts against the United States on September 11, 2001 causing personal injuries to the Plaintiffs.

666.    WHEREFORE,  judgement is demanded against KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO jointly and severally, in a sum to be determined by a jury.


## COUNT TWO


### AIDING, ABETING AND CONSPIRING WITH AL-QAEDA TO CONDUCT THE ATTACKS ON  THE UNITED STATES ON SEPTEMBER 11, 2001 IN VIOLATION OF 18 U.S.C. § 2332A; 18 U.S.C. § 2332B;  AND 18 U.S.C. § 2333


667.    Plaintiffs repeat, reiterate and reallege each and every paragraph contained in this Complaint as if set forth more fully at length herein, and further allege the following.

668.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO supported Al-Qaeda in using

97

hijacked airplanes as weapons of mass destruction against the United States on September 11, 2001 causing personal inuries to the plaintiffs.

669.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO substantially assisted Al-Qaeda in using hijacked airplanes as weapons of mass destruction against the United States on September 11, 2001 causing personal injuries to the plaintiffs.

670.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO knew that they were providing material support to Al-Qaeda in using hijacked airplanes as weapons of mass destruction against the United States on September 11, 2001 causing personal injuries to the plaintiffs.

671.    As set forth above, without the assistance of Defendants KINGDOM OF SAUDI ARABIA, SAUDI BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and

DALLAH AVCO, Al-Qaeda could not have successfully carried out the attacks on September 11, 2001 against the United States causing personal injuries to the plaintiffs.

672.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO agreed and conspired to attack the United States on September 11, 2001 with Al-Qaeda in using hijacked airplanes as weapons of mass destruction against the United States on September 11, 2001 causing personal injuries to the plaintiffs making them jointly and severally liable for any and all damages sustained by the Plaintiffs.

673.    WHEREFORE,  judgement is demanded against KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO jointly and severally, in a sum to be determined by a jury.

## COUNT THREE

### PROVIDING MATERIAL SUPPORT TO DESIGNATED FOREIGN TERRORISTS ON SEPTEMBER 11, 2001 IN VIOLATION OF 18 U.S.C. § 2339A, 18 U.S.C. § 2339B(1) AND 18 U.S.C. § 2333

674.    Plaintiffs repeat, reiterate and reallege each and every paragraph conatained in this Complaint as if set forth more fully at length herein, and further allege the following.

99

675.   As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO knowingly and/or recklessly contributed material support or resources, directly or indirectly, to  Osama Bin Laden and Al-Qaeda in order to commit acts of terrorism against  the United States and its citizens on September 11, 2001.

676.   As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO provided material support and/or resources in concealing or disguising the nature, location,  source or ownership of material support or resources knowing or intending that the support is to be used in preparation, or in carrying out violations listed in 18. U.S.C. §§ 2332a, 2332b and 2333f by proving tangibile or intangible property, services, currency, monetary instruments, financial securities, financial services, lodging, training, expert advice, assistance, safe houses, false documentation, false identification, communcations equipment, facilities, weapons, lethal substances, personnel, and transportation to  Osama Bin Laden and Al-Qaeda in order to commit acts of terrorism against  the United States and its citizens on September 11, 2001.

677.   Defendants NATIONAL COMMERCIAL BANK, AL RAJHI BANK, DUBAI ISLAMIC BANK as financial instituations violated 18. U.S.C. § 233B(2) when each of them became aware that it had possession and/or control over funds in which a foreign terrorist organization and/or its

agent had an interest in Osama Bin Laden and/or Al-Qaeda, and failed to retain possession and control over said funds and report them to the appropriate authorities.

678.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO are jointly and severally liable pursuant to 18 U.S.C. § 2333 for  causing peronal injuries to the plaintiffs as a result of the attacks on the United States on September 11, 2001.

679.    WHEREFORE,  judgement is demanded against KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO jointly and severally, in a sum to be determined by a jury.

## COUNT FOUR

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(2) AND 18 U.S.C. § 2333

680.    Plaintiffs repeat, reiterate and reallege each and every paragraph contained in this Complaint as if set forth more fully at length herein, and further allege the following.

681.    As set forth above, Defendants NATIONAL COMMERCIAL BANK, AL RAJHI BANK, and DUBAI ISLAMIC BANK are sophisticated international financial institutions.

682.    Defendants NATIONAL COMMERCIAL BANK, AL RAJHI BANK, and DUBAI ISLAMIC BANK knowingly collected funds on behalf of, and transferred funds for the benfit of Osama Bin Laden and Al-Qaeda's charity agents with knowledge of Al-Qaeda's interests in such funds.

683.    Defendants NATIONAL COMMERCIAL BANK, AL RAJHI BANK, and DUBAI ISLAMIC BANK have provided material support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of U.S.C. §§ 2339B(2)(a) and 2339B(2)(b).

684.    Defendants NATIONAL COMMERCIAL BANK, AL RAJHI BANK, and DUBAI ISLAMIC BANK knew of Osama Bin Laden and Al-Qaeda's charities' role as agents for Al-Qaeda.

685.    Defendants NATIONAL COMMERCIAL BANK, AL RAJHI BANK, and DUBAI ISLAMIC BANK recklessly disregarded information that would have caused them to know that of Osama Bin Laden and Al-Qaeda's charities were agents of Al-Qaeda with intentions to commit terrorist activities on the United States.

686.    Defendants NATIONAL COMMERCIAL BANK, AL RAJHI BANK, and DUBAI ISLAMIC BANK aided, abetted and conspired with Osama Bin Laden and Al-Qaeda concerning the September 11, 2001 terrorist attacks on the United States which ultimately caused Plaintiffs' injuries.

687.    Defendants NATIONAL COMMERCIAL BANK, AL RAJHI BANK, and DUBAI ISLAMIC BANK violated 18 U.S.C. § 2339(B)(2) by failing to retain possession of, or maintain control of, all funds belonging to or meant to be transferred to Osama Bin Laden and/or agents of Al-Qaeda.

688.    Defendants NATIONAL COMMERCIAL BANK, AL RAJHI BANK, and DUBAI ISLAMIC BANK violated 18 U.S.C. § 2339(B)(2) by failing to report the existence of funds belonging to or being transferred to Osama Bin Laden and/or Al-Qaeda.

689.    Defendants NATIONAL COMMERCIAL BANK, AL RAJHI BANK, and DUBAI ISLAMIC BANK are jointly and severally liable pursuant to 18 U.S.C. § 2333 for causing personal injuries to the plaintiffs as a result of the attacks on the United States on September 11, 2001.

690.    WHEREFORE, judgment is demanded against NATIONAL COMMERCIAL BANK, AL RAJHI BANK, and DUBAI ISLAMIC BANK jointly and severally, in a sum to be determined by a jury.

## COUNT FIVE

## COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2333

691.    Plaintiffs repeat, reiterate and reallge each and every paragraph conatained in this Complaint as if set forth more fully at length herein, and further allege the following.

692.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO violated 18 U.S.C. § 2331 by providing funding and other forms for material support to Osama Bin Ladin and/or Al-Qaeda along with their agents concerning the terrorist attacks against the United States on September 11, 2001.

693.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION,

103

WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO provided substantial assistance to Osama Bin Ladin and/or Al-Qaeda and their agents in planning, coordinating and carrying out the the terrorist attacks against the United States on September 11, 2001.

694.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO caused Plaintiffs' injuries by providing funding and other forms of material support to assistance to Osama Bin Ladin and/or Al-Qaeda along with their agents in planning, coordinating and carrying out the the terrorist attacks against the United States on September 11, 2001.

695.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO's actions in proving funding and other forms of material support to Osama Bin Ladin and/or Al-Qaeda along with their agents occurred outside the boundaries of the United States and crossed international boundaries.

696.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION,

104

WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO knowingly provided substantial assistance to acts of international terrorism.

697.    Osama Bin Ladin and/or Al-Qaeda could not have successfully planned, coordinated and carried out the terrorist attacks against the United States on September 11, 2001 but for the assistance of Defendants KINGDOM OF SAUDI ARABIA, SAUDI BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO.

698.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO are jointly and severally liable pursuant to 18 U.S.C. § 2333 for  causing personal injuries to the plaintiffs as a result of the attacks on the United States on September 11, 2001.

699.    WHEREFORE,  judgement is demanded against KINGDOM OF SAUDI ARABIA, SAUDI BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC

FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO jointly and severally, in a sum to be determined by a jury.

COUNT SIX

COMMITTING FINANCING OF TERRORISM IN VIOLATION
OF 18 U.S.C. § 2333  AND 18 U.S.C. § 2339C

700.    Plaintiffs repeat, reiterate and reallege each and every paragraph contained in this Complaint as if set forth more fully at length herein, and further allege the following.

701.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO willfully and unlawfully provided financial assistance and additional services to Osama Bin Ladin and/or Al-Qaeda along with their agents in planning, coordinating and carrying out the terrorist attacks against the United States on September 11, 2001.

702.    As set forth above, the Defendants KINGDOM OF SAUDI ARABIA, SAUDI BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO's acts in providing financial assistance and additional services to Osama Bin Ladin and/or Al-Qaeda for the terrorist attacks against the United States on September 11, 2001 were intended to (a) intimidate or coerce the civilian population of the United States, (b) to influence the policy of the government of the

106

United States by intimidation or coercion and (c) to affect the conduct of the government of the United States by mass destruction and murder.

703.    Osama Bin Ladin and/or Al-Qaeda could not have successfully planned, coordinated and carried out the terrorist attacks against the United States on September 11, 2001 but for the financial assistance provided by the Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO.

704.    As set forth above, Defendants KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO are jointly and severally liable pursuant to 18 U.S.C. § 2333 for  causing personal injuries to the plaintiffs as a result of the attacks on the United States on September 11, 2001.

705.    WHEREFORE,  judgement is demanded against KINGDOM OF SAUDI ARABIA, SAUDI  BINLADIN GROUP, MOHAMED BINLADIN COMPANY, MOHAMED BINLADIN ORGANIZATION, PRINCE MOHAMED BIN FAISAL AL SAUD, NATIONAL COMMERCIAL BANK, YASIN KADI, MUSLIM WORLD LEAGUE, INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, AL HARAMAIN ISLAMIC FOUNDATION, AL RAJHI BANK, DUBAI ISLAMIC BANK and DALLAH AVCO jointly and severally, in a sum to be determined by a jury.

## COUNT SEVEN

### WRONGFUL DEATH

706. Plaintiffs incorporate herein by reference the averments contained in all the preceding paragraphs.

707. The Deceased Plaintiffs and Personal Representatives of the respective Estates bring this action for wrongful death proximately caused by the Defendants engaged in the sponsoring, financing, aiding, abetting and/or otherwise conspiring to commit acts of terror including the terrorist attacks of September 11, 2001.

708. Surviving family members are entitled to recover damages from Defendants for these wrongful deaths. These family members are entitled to all damages incurred as fair and just compensation for the injuries resulting from these wrongful deaths.

709. The injuries and damages suffered by the Plaintiffs were proximately caused by the intentional, malicious, reckless, negligent acts of the defendants as described herein.

710. As a proximate result of the wrongful deaths of the decedents, their heirs and families have been deprived of future aid, income, assistance, services, comfort, companionship, affection and financial support.

711. As a direct and proximate result of the defendant's acts of terrorism resulting in wrongful death, the heirs and families have been deprived of furture aid, income, assistance, services, comfort, companionship, affection and financial support.

712. As a direct and proximate result of the defendants' acts of terrorism resulting in wrongful death, the heirs and families of the decedents suffer and will continue to suffer permanent loss, emotional distress, severe trauma, and permanent physical and psychological injuries.

713.    As a further result of intentional, malicious, reckless, negligent, wrongful, illegal acts, and tortuous conduct of the Defendants, the Plaintiffs have incurred actual damages including but not limited to medical expenses, psychological trauma, physical injuries, and other expenses and losses for which they are entitled to full recovery.

714.    **WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally and/or individually, in a sum to be determined by a jury.

## COUNT EIGHT

### PUNITIVE DAMAGES

715.    Plaintiffs incorporate herein by reference the averments contained in all the preceding paragraphs.

716.    The actions of the defendants, acting in concert or otherwise conspiring to carry out, aid and abet these unlawful objectives of terror, were intentional, malicious, unconscionable and in reckless disregard of the rights and safety of all Plaintiffs. Defendants, acting individually, jointly, and/or severall intended to carry out actions that would serious and gravely injure or kill the lives of all of the Plaintiffs herein.

717.    As a result of their intentional, malicious, outrageous, willful, reckless conduct, the defendants are individually, jointly and severally liable to all Plaintiffs for punitive damages.

718.    **WHEREFORE**, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and or individually, in an amount in excess of One Trillion Dollars ($1,000,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.

## COUNT NINE

### PUNITIVE DAMAGES – AGENCIES AND INSTRUMENTALITIES OF THE FOREGIN STATE DEFENDANT

719.    Plaintiffs incorporate herein by reference the averments contained in all the preceding paragraphs.

720.    The foreign state Defendants and its agencies and instrumentalities, directly or indirectly caused, contributed to, supported, conspired to cause, aided and abetted the commission of the terrorist acts that resulted in the deaths and injuries of the Plaintiffs herein as described above.

721.    The actions of the agencies and instrumentalities of the foreign state defendant, acting individually, and/or in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights of all Plaintiffs. These agencies and instrumentalities acting indivudally and jointly, specifically intended to engage in or otherwise sponsor terrorism.

722.    Pursuant to 28 U.S.C.A. §1606, which specifically authorizes a claim for punitive damages arising from state sponsored terrorist acts actionable under 28 U.S.C. §1605 (a)(7), and for the reasons stated herein, the agencies and instrumentalities of the foreign state Defendants are jointly and severally liable to all Plaintiffs for punitive damages.

723.    Pursuant to Pub. L. 104-208, Div. A, Title I, §101(c), 110 Stat. 3009-172 (reprinted at 28 U.S.C. §1605 note (West Supp.), all Defendants who are officials, employees or agents of the foreign state defendant, the Kingdom of Saudi Arabia and instrumentalities are also individually liable to Plaintiffs for punitive damages caused by the acts and conduct which resulted in the deaths and/or injuries of the Plaintiffs.

724.    **WHEREFORE**, Plaintiffs demand judgment in their favor against the Foreign State Defendants, the Kingdom of Saudi Arabia and its instrumentalities, and each of their officials, employees, or agents, jointly, severally and/or individually, in an amount in excess of One Hundred Trillion Dollars ($100,000,000,000,000) plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing terrorist acts.

## JURY DEMAND

Plaintiffs demand that all issues of fact in this case be tried by jury.

January 20, 2017

Respectfully Submitted,

/s/ Christopher R. LoPalo
Christopher R. LoPalo, Esq. (CL-6466)
Paul J. Napoli, Esq. (PN-8845)
NAPOLI SHKOLNIK, PLLC
400 Broadhollow Rd., Ste 305
Melville, New York 11747
Telephone (212) 397-1000
clopalo@napolilaw.com
pnapoli@napolilaw.com